David COLAN, Plaintiff-Appellant,

v.

CUTLER–HAMMER, INC., Eaton Corporation, and Koppers Company, Inc., Defendants-Appellees.

No. 86–2013.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 9, 1987.

Decided Feb. 24, 1987.

Rehearing and Rehearing En Banc Denied March 25, 1987.

Arthur T. Susman, Joseph, Susman & Myers, Chicago, Ill., for plaintiff-appellant.

Larry L. Thompson, Bell, Boyd & Lloyd, Lynne M. Raimondo, Mayer, Brown & Platt, Chicago, Ill., for defendants-appellees.

Before CUMMINGS and FLAUM, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

PER CURIAM.

The plaintiff, David Colan, brings this derivative action on behalf of Eaton Corporation, pursuant to § 16(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78p(b) (1982), to recover short-swing profits allegedly obtained by defendant-appellee Koppers Company through transactions made in 1978 in the stock of Cutler-Hammer, Inc. Due to a merger between these two companies, Cutler-Hammer's assets are now owned by Eaton. The district court entered summary judgment for Koppers and we affirm.

The plaintiff alleges that Koppers and Eaton entered into a secret agreement pursuant to which Eaton would defer the Cutler-Hammer shareholders' meeting and the closing of the merger between Cutler-Hammer and Eaton in order to shield Koppers from § 16(b) liability. The district court rejected the plaintiff's allegations, and granted the defendant Kopper's motion for summary judgment.

On appeal the plaintiff argues that the district court erred in granting summary judgment, because significant issues of material fact existed as to the alleged secret agreement. The plaintiff also contends that the district court erred in its conclu-

sion that, even if a secret agreement exist-ed, there was no sale for § 16(b) purposes, because significant conditions precedent to the closing remained unfulfilled.

 After examining the record and the briefs and hearing oral argument, we conclude that the grant of summary judgment in this case was proper. In reviewing a grant of summary judgment we must decide whether the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329–30 (7th Cir.1987). We agree with the district court that after drawing all reasonable inferences in the light most favorable to the plaintiff, *see Bartman v. Allis-Chalmers*, 799 F.2d 311, 312–13 (7th Cir.1986), no genuine issues of material fact exist. Because Judge Nordberg's opinion contains an excellent discussion and analysis of this case, we believe that any additional discussion by this court is unnecessary, and thus we adopt the district court's opinion as our own. The district court's opinion follows in an appendix to this opinion.

AFFIRMED.

1. In its Memorandum Opinion and Order dated May 4, 1984, this court held that Colan, as an Eaton shareholder, has standing to bring this suit.

2. Also before the court are Koppers' motion to strike Colan's memorandum and for other sanctions, and Colan's motion to set a pretrial briefing schedule and to set dates for the pretrial conference and trial. The court denies both of these motions.

In its motion to strike, Koppers argues that Colan's memorandum in opposition to Koppers' motion for summary judgment "is replete with literally scores of false and distorted 'statements of facts' which are not well grounded in fact, but are contradicted by or unrelated to the depositions and documents cited by plaintiff." According to Koppers, Colan's memorandum creates an issue of fact as to the existence of a secret agreement between Koppers and Eaton to delay the merger only through such distortion. Therefore, the court should, pursuant to Fed.R. Civ.P. 11, strike Colan's memorandum, impose Koppers' expenses and attorneys fees incurred in responding to Colan's memorandum against Colan, and award Koppers such relief as the court deems just and proper.

## APPENDIX

No. 80 C 4118

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

## EASTERN DIVISION

## MEMORANDUM OPINION AND ORDER

JOHN A. NORDBERG, District Judge.

 Plaintiff, David Colan, brought this action under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1982), on behalf of Eaton Corporation ("Eaton"), of which he is a shareholder.[1] Eaton's subsidiary, New CHI, Inc. ("New CHI") is the surviving corporation in the merger of New CHI and Cutler-Hammer, Inc. ("Cutler-Hammer"). Colan brought this action against Koppers Company, Inc. ("Koppers") to recover alleged short-swing profits realized by Koppers upon the purchase and sale of Cutler-Hammer stock during 1978. This matter is now before the court on Koppers' motion for summary judgment.[2] For the reasons set

Rule 11 provides:
Every pleading ... shall be signed by at least one attorney. ... The signature of an attorney ... constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include ... the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee.

The test under Rule 11 is objective: litigation must be grounded in an objectively reasonable view of the facts and the law, and, if it is not, the lawyer or party proceeding recklessly must foot the bill. *Thornton v. Wahl*, 787 F.2d 1151,

forth below, the court grants Koppers' motion for summary judgment.

## I. MOTION FOR SUMMARY JUDGMENT

On a motion for summary judgment, the moving party has the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Cedillo v. Int'l Ass'n of Bridge and Structural Iron Workers,* 603 F.2d 7, 10 (7th Cir.1979). In determining whether any material fact remains in dispute, the court must view all inferences in the light most favorable to the non-moving party. *Regner v. City of Chicago,* 789 F.2d 534, 536 (7th Cir.1986). However, the nonmoving party may not merely rely on conclusory pleadings to withstand summary judgment. In responding to a motion for summary judgment, a non-moving party must set forth specific facts in affidavits or otherwise show that there is a genuine issue of material fact that must be decided at trial. *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983).

Koppers has moved for summary judgment. Therefore, this court must view all inferences in the light most favorable to Colan. Colan contends that there are genuine issues of material fact that preclude this court from granting Koppers' motion for summary judgment. Drawing all reasonable inferences that can be made in

Colan's favor, the court finds that there are no genuine issues of material fact and that Koppers is entitled to summary judgment as a matter of law.

## II. FACTS

### A. THE PARTIES

Cutler-Hammer was a Delaware corporation involved in the manufacture of electronic equipment. Cutler-Hammer stock was traded on the New York Stock Exchange. During all times relevant to this action, Edmund B. Fitzgerald was the Chairman and Chief Executive Officer of Cutler-Hammer, and also an outside director of Koppers. The Wisconsin law firm of Michael, Best & Friedrich represented Cutler-Hammer in the negotiation and preparation of both the sale of convertible preferred stock to Koppers and the merger of Eaton and Cutler-Hammer. The investment banking firm of Morgan, Stanley & Co., Inc. represented Cutler-Hammer in the sale of stock to Koppers.

Eaton is an Ohio corporation predominantly engaged in the manufacture of heavy industrial equipment. Eaton stock is traded on the New York Stock Exchange. At all times relevant to this action, Edward Mandell DeWindt was the Chairman and Chief Executive Officer of Eaton. On August 23, 1978, DeWindt became a director of Cutler-Hammer. Robert G. Brown is the former Vice-President of Corporate Development at Eaton, and as such, handled Eaton's acquisitions and divestitures.

1154 (7th Cir.1986); *Frazier v. Cast,* 771 F.2d 259, 265 (7th Cir.1985); *In Re TCI Ltd.,* 769 F.2d 441, 450 (7th Cir.1985). Although the court finds, in the text of this opinion, that Colan does not raise a genuine issue of material fact in his opposing memorandum, the court does not find that there is absolutely nothing in the evidence to support Colan's argument that Koppers and Eaton entered into a secret agreement to delay the merger of Eaton and Cutler-Hammer, nor does the court find that Colan made no attempt to ascertain whether this argument might have a basis in fact. Therefore, the court denies Koppers' motion for Rule 11 expenses, fees and sanctions.

In addition, because the court grants Koppers' motion for summary judgment, the court denies Colan's motion to set a schedule for the pretrial brief, the pretrial conference and the trial. It is

clear that, where one defendant files a motion for summary judgment which the court grants, the district court may *sua sponte* enter summary judgment in favor of additional non-moving defendants if the motion raised by the first defendant is equally effective in barring the claim against the other defendants, and the plaintiff had an adequate opportunity to argue in opposition to the motion. *Malak v. Associated Physicians, Inc.,* 784 F.2d 277, 280 (7th Cir.1986). Thus, although Koppers and Eaton are both defendants in this action, and Koppers alone moves for summary judgment, the court, *sua sponte,* enters summary judgment in favor of Eaton as well as Koppers. Koppers' arguments, that no secret agreement existed and that there was no § 16(b) sale, effectively bar Colan's § 16(b) claim against Eaton, which, in any event, was a nominal party from the start.

Brown took notes of several discussions which Colan now alleges evidence a secret agreement between Eaton and Koppers. Brown also became a Cutler-Hammer director on August 23, 1978. Eaton employed the investment banking firm of Lehman Brothers to accomplish its merger with Cutler-Hammer. Peter G. Peterson, the former Chairman and President of Lehman Brothers, headed the Lehman team hired to assure the successful merger of Eaton and Cutler-Hammer.

Koppers is a Pennsylvania corporation principally engaged in the manufacture of industrial chemicals. Koppers' stock is traded on the New York Stock Exchange. At all times relevant to this action, Fletcher L. Byrom was the Chairman of the Board of Koppers. The investment banking firm of First Boston Corporation represented Koppers in the merger negotiations with Eaton.

### B. KOPPERS' PURCHASE OF CUTLER-HAMMER STOCK IN 1978

In March of 1978, Cutler-Hammer learned that Tyco Laboratories, Inc. had begun making large anonymous open market purchases of Cutler-Hammer common stock. On March 19, 1978, Fitzgerald and Byrom, along with others, met in Pittsburgh to discuss whether Koppers would like to purchase Cutler-Hammer stock. Koppers' Board of Directors met on March 27, 1978 to discuss the possible investment in a new issue of Cutler-Hammer convertible preferred stock in the amount of approximately 25 to 30 million dollars. The Koppers Board authorized the investment within certain general guidelines. The Board also authorized, upon completion of the investment, the purchase of additional Cutler-Hammer common stock sufficient for Koppers to hold 20% of Cutler-Hammer's outstanding stock for equity account-

ing purposes. Fitzgerald did not attend this meeting, and, because of his position as an outside director of Koppers, abstained from any involvement in the subsequent negotiations between Koppers and Cutler-Hammer concerning the possible investment.

On April 8, 1978, the Cutler-Hammer Board of Directors approved the proposed preferred stock sale to Koppers. On April 9, 1978, the Executive Committee of Koppers' Board reviewed and approved the agreement for the proposed stock purchase. The transaction was closed and the agreement executed on April 10, 1978, when Cutler-Hammer placed an issue of 650,000 shares of convertible preferred Cutler-Hammer stock with Koppers, for a negotiated price of $45 per share. Under the terms of the stock purchase agreement, the preferred dividend rate was the same as the current dividend rate for common stock, the preferred stock was convertible into common stock on a one-for-one basis, and, if converted, the preferred stock represented 9.9% of Cutler-Hammer's outstanding common stock.

After this initial purchase, Koppers began to purchase shares of Cutler-Hammer common stock on the open market. From April 10 until April 14, 1978, Koppers bought 742,500 shares of Cutler-Hammer common stock on the open market at an average price of $44.25 per share. Koppers then held approximately 21 to 22 percent of Cutler-Hammer's stock, if all of the preferred shares were converted to common stock.

On May 31, 1978, Koppers converted 640,000 of its 650,000 shares of convertible preferred shares into common stock. Koppers did not convert all of its preferred shares in order to preserve any special voting rights attached to the class of preferred stock.[3]

---

**3.** When the Cutler-Hammer Board of Directors approved the preferred stock sale to Koppers on April 7, 1978, its Resolution creating the preferred stock series stated, with regard to voting rights:

(4) *Voting Rights.* Holders of the Series A [Preferred] Stock shall be entitled to one vote for each share held on all questions upon

which shareholders are entitled to vote. Holders of the Series A Stock shall also have the right to vote as a class as provided by the applicable laws of the State of Delaware, and by the certificate of Incorporation of the Corporation.

## C. THE MERGER OF EATON AND CUTLER-HAMMER

On June 12, 1978, Eaton purchased Tyco's entire 33% stock interest in Cutler-Hammer—2,105,900 shares of common stock—for $115.8 million, or approximately $55 per share. Thereafter, on June 22, 1978, Eaton announced its plan to make a tender offer for all Cutler-Hammer stock.

The Boards of Directors of Eaton and Cutler-Hammer approved an Agreement and Plan of Merger on June 26, 1978 ("the Agreement"). The Agreement provided for the proposed merger of New CHI and Cutler-Hammer, and the conversion of each common and preferred share of Cutler-Hammer into $58 cash or a fixed-interest bearing subordinated installment note at the election of the stockholder.[4] The Agreement conditioned the merger upon: (1) the approval of Cutler-Hammer's shareholders at a meeting to be held on a mutually agreeable date for Eaton and Cutler-Hammer, but no later than April 30, 1979; (2) an order for the S.E.C. declaring the registration of the Eaton installment notes effective; (3) Cutler-Hammer's filing of a proxy statement with the S.E.C.; (4) approval from the Federal Trade Commission ("F.T.C.")[5] and the Department of Justice; (5) the absence of any litigation, proceeding or investigation, actual or threatened, with regard to the merger; and (6) opinion letters of counsel for both companies and the certificate of Cutler-Hammer's President to be rendered after Cutler-Hammer's shareholders approved the merger.

Pursuant to the Agreement, Eaton issued a tender offer for all outstanding shares of Cutler-Hammer stock on July 17, 1978, at the price of $58 per share. By the conclusion of the tender offer on August 7, 1978, Eaton had acquired a 62% interest in Cutler-Hammer. Koppers did not tender or otherwise offer to sell its Cutler-Hammer preferred or common stock to Eaton during the period of the tender offer.[6]

As for the required shareholders' meeting, on August 23, 1978, the Cutler-Hammer Board of Directors set the required meeting date for October 2, 1978, but gave the Chairman, Fitzgerald, authority to change the date without further Board action. Subsequently, Fitzgerald postponed the October 2, 1978 meeting date. On October 20, 1978, Fitzgerald set the meeting date for December 14, 1978, with the concurrence of Eaton's Chairman, and on November 6, 1978, a Notice of Special Shareholders' Meeting, Proxy Statement and Form of Proxy were sent to all record shareholders.[7] The shareholders met on December 14, 1978, and approved the merger, subject to the satisfaction or waiver of the remaining closing conditions. Those conditions were satisfied when the merger closed on January 2, 1979. On that date, Koppers sold all of its Cutler-Hammer stock and received $58 per share from Eaton, pursuant to the terms of the merger.

As for the required governmental authorizations, on August 21, 1978, Eaton submitted a draft Registration Statement to the S.E.C. On September 19, 1978, the S.E.C. responded with a multitude of questions and proposed changes. On October 23, 1978, Eaton filed an amended Registration Statement with the S.E.C. The S.E.C.

---

See Exhibit "4" to Koppers' Memorandum in Support of Motion for Summary Judgment ("Koppers' Memorandum") at 3061.

**4.** The installment notes Eaton offered were considered "securities"; therefore, Eaton was required to file a Registration Statement for the installment notes with the Securities and Exchange Commission ("S.E.C.").

**5.** Eaton and Cutler-Hammer competed in certain product lines; therefore, the F.T.C. requested both to provide the F.T.C. with documents to aid its antitrust investigation.

**6.** In fact, Eaton's tender offer specifically noted that Eaton had no agreement or understanding with Koppers as to the tender offer or otherwise. See Exhibit "15" to Koppers' Memorandum at 95.

**7.** Koppers returned its signed proxy for its common shares, without designating its vote on the proposed merger, in early December, 1978. See Exhibit "20" to Koppers' Memorandum. Koppers did not receive a proxy for its 10,000 preferred shares, which at that time comprised 100% of the outstanding Cutler-Hammer preferred stock class. See Exhibit "21" to Koppers' Memorandum at 98.

finally declared the Registration Statement effective on November 3, 1978. As for F.T.C. approval of the merger, the F.T.C. requested Eaton and Cutler-Hammer to provide documents to the F.T.C., and, on October 20, 1978, Eaton made those documents available to the F.T.C. Eaton did not consider that it had the F.T.C.'s approval of the merger until December 14, 1978.

### III. CONTENTIONS OF THE PARTIES

Colan now brings this action under § 16(b) of the Securities Exchange Act of 1934. Section 16(b) prohibits a purchase and sale or sale and purchase of an issuer's stock by officers, directors, or beneficial owners of more than 10% of any class of securities of the issuer within any period of less than six months. Colan alleges that Koppers was an insider and profited from its purchase and sale of Cutler-Hammer stock in 1978, in violation of § 16(b). According to Colan, Koppers and Eaton entered into a secret oral agreement pursuant to which Eaton would defer the Cutler-Hammer shareholder meeting and the closing of the merger in order to shield Koppers from § 16(b) liability, and Koppers would forego the Cutler-Hammer fourth quarter dividend to its shareholders, not interfere with the merger in any way, and

sell its stock to Eaton at the merger price when the closing took place. This alleged secret agreement was "effectively sealed" on August 23, 1978, the date of the Cutler-Hammer Board of Directors meeting at which the Board gave Fitzgerald the authority to set the date of the shareholders' meeting. Colan also contends that, by August 23, 1978, the merger was a "substantial certainty" because all significant conditions precedent to the merger were satisfied by that date.

Koppers, on the other hand, denies the existence of a secret agreement with Eaton to defer the date of the merger. Also, Koppers contends that, even if it had made such an agreement with Eaton, the agreement would not constitute a "sale" under § 16(b). In addition, Koppers asserts that the transaction was not within the ambit of § 16(b) as a matter of law under the Supreme Court's decision in *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).[8] Finally, Koppers argues that § 16(b) liability, if any, does not include Koppers' profit from its purchase and sale of the initial 650,000 shares, because prior to that purchase Koppers was not a beneficial owner of 10% of Cutler-Hammer's stock.[9]

---

**8.** In this order, the court grants Koppers' motion for summary judgment on the bases that there was no secret agreement between Koppers and Eaton to delay the merger, and, even if there were a secret agreement, it did not constitute a § 16(b) sale. Therefore, the court need not, and does not, reach the *Kern* issue. Nor does the court address the question of whether Judge Bua's rejection of Koppers' *Kern* argument in *Colan v. Cutler-Hammer, Inc.*, 516 F.Supp. 1342, 1344–45 (N.D.Ill.1981), established the law of the case, which this court must follow absent special circumstances. *See United States v. Mazak*, 789 F.2d 580, 581 (7th Cir. 1986).

**9.** Although the court need not reach this issue, the court notes that, under *Foremost-McKesson, Inc. v. Provident Securities Co.*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976), the threshold stock purchase that pushes a defendant over the ten percent floor is not a § 16(b) "purchase." Only purchases made after the initial ten percent or more purchase give rise to liability when matched with subsequent sales occurring within six months. *See* Hazen, *The Law of Securities Regulation* 423 (1985).

Also, Colan's reliance on the "deputization" theory, announced by the Supreme Court in *Blau v. Lehman*, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), is misplaced. Cutler-Hammer might have been considered to be a Koppers director, under the deputization doctrine, by virtue of Fitzgerald's positions as Cutler-Hammer's Chairman and a Koppers director. However, Koppers may not be considered to be a Cutler-Hammer director by virtue of Fitzgerald's dual positions. Fitzgerald did not hold the required position of power at Koppers necessary under the deputization doctrine. *See Feder v. Martin Marietta Corp.*, 406 F.2d 260 (2d Cir. 1969), *cert. denied*, 396 U.S. 1036, 90 S.Ct. 678, 24 L.Ed.2d 681 (1970).

Finally, S.E.C. rule 16–b(9), 17 C.F.R. § 240.-16b–9 (1986), makes clear that a conversion of stock, such as Koppers' conversion of 640,000 of its preferred shares on May 31, 1978, is not a § 16(b) sale or purchase. Under Rule 16–b(9), a § 16(b) purchase and sale occurs only when the convertible stock is purchased, and the converted stock sold, within six months. Rule 16–b(9) has been in effect at all times relevant to this lawsuit.

## IV. THE EXISTENCE OF THE SECRET AGREEMENT

As stated above, a plaintiff responding to a motion for summary judgment may not merely rely on conclusory pleadings, but must set forth specific facts in evidentiary affidavits or otherwise show that there are genuine, material factual issues that must be decided at trial. The court now finds that Colan's conclusory assertion of the existence of a secret agreement is wholly unsupported and fails to establish a genuine issue of material fact, even when the facts are viewed in the light most favorable to Colan.

In support of his allegation that Eaton and Koppers entered into a secret agreement, Colan points to various notes which allegedly evidence negotiations and an agreement between Koppers and Eaton. Colan also points to the fact that the deferral of the merger closing occurred shortly after the alleged negotiations between Eaton and Koppers as evidence of the secret agreement.

Colan primarily relies on the notes of Peterson of Lehman Brothers,[10] Brown of Eaton,[11] Robert Crease of Eaton,[12] and Paul Miller of First Boston[13] as evidence of the negotiation and consummation of a secret agreement between Eaton and Koppers to delay the merger. However, these notes are equivocal at best as to the negotiation and existence of such a secret agreement. Also, both Peterson and Brown stated under oath in their depositions that their notes reflect internal speculations and "flitting" thoughts, as well as conversations with other officers or bankers concerning business transactions.[14] More importantly, Peterson, Brown, and Miller, again under oath in their depositions, testified that, to the best of their knowledge, there was no agreement between Koppers and Eaton to delay the merger for the purpose of allowing Koppers to retain its § 16(b) profit.[15] It is inconceivable that there could have been such an agreement without their knowledge.

In contrast to Colan's scant, equivocal "evidence" of the negotiation and consummation of a secret agreement between Koppers and Eaton, Koppers points out that every person who had a significant role in the merger of Eaton and Cutler-Hammer, including DeWindt, Byrom, Fitzgerald, Pe-

---

10. See Exhibit "A.23" to Colan's Memorandum in Opposition to Koppers' Motion For Summary Judgment ("Colan's Memorandum").

11. See Exhibit "A.15" to Colan's Memorandum.

12. See Exhibit "A.41" to Colan's Memorandum.

13. See Exhibit "A.19" to Colan's Memorandum.

14. See Exhibit "26" to Koppers' Memorandum at 63; Exhibit "C" to Koppers' Reply Memorandum in Support of Motion for Summary Judgment ("Koppers Reply Memorandum") at 79–80. Also, Brown testified that he often threw away his notes. See Exhibit "C" to Koppers' Reply Memorandum at 16. In addition, Peterson testified that he did not date his notes and could not remember the exact date on which he composed the notes. See Exhibit "D" to Koppers' Reply Memorandum at 62–63.

A district court, in a federal summary judgment proceeding, may consider materials beyond the pleadings, including exhibits to affidavits and exhibits made a part of a deposition record. Fed.R.Civ. P. 56(e); First National Bank Co. v. Insurance Company of North America, 606 F.2d 760, 766 (7th Cir.1979). However, the court may only consider evidence and statements that would be admissible at trial and that have probative force. Rule 56(e); First National, 606 F.2d at 766. But see 10A C. Wright, A. Miller, and M. Kane, Federal Practice and Procedure § 2722 at 60 (2d ed. 1983) (inadmissible documents may be considered by court if not challenged).

The court now finds that the notes of Peterson and Brown would be inadmissible as evidence at trial, in that they are incomplete, unreliable and ridden with hearsay statements. None of the hearsay exceptions, such as the regularly kept business record exception in Fed.R.Evid. 803(6), or the party-opponent admission exception in Fed.R.Evid. 801(d)(2), apply in this case. Therefore, the court has not considered these notes in rendering its decision on the motion for summary judgment. However, even if the notes were admissible as evidence, and the court considered the notes in rendering its decision, the court's decision would remain the same, as the notes do not create an issue of material fact as to the existence of a secret agreement between Koppers and Eaton.

15. See Exhibit "26" to Koppers' Memorandum at 63–64; Exhibit "C" to Koppers' Reply Memorandum at 27; Exhibit "27" to Koppers' Memorandum at 57–58.

terson, and Miller, has expressly denied under oath that Koppers and Eaton reached an agreement or understanding with respect to the timing of the merger. The depositions of these individuals demonstrate that, instead of secretly agreeing to delay the merger, Eaton officials considered what Koppers might do to protect its profits, and Koppers communicated to Eaton that it would protect its interests.[16] The depositions also demonstrate, and Colan admits, that Cutler-Hammer desired to delay the merger until January of 1979, at least in part because a new capital gains tax law would take effect at that time.[17] This change would benefit many Cutler-Hammer shareholders, but not Koppers, as Koppers did not qualify for long-term capital gains treatment.

At this point, the court notes the arbitrariness of the date selected by Colan as the date of the secret agreement. No significant event occurred on that date. Yet, Colan asserts that, on August 23, 1978, the secret agreement was "effectively sealed" because, on that date, Eaton allowed the Cutler-Hammer Board of Directors to grant Fitzgerald the authority to unilaterally set the date of the shareholders' meeting. Therefore, Colan contends that August 23, 1978 is the date of the agreement. However, at the same time, Colan asserts that Koppers and Eaton actually entered into the purported agreement prior to August 23, 1978.[18] Although the court appreciates the difficulty involved in selecting the date of an alleged secret, unwritten agreement between third parties, the court cannot help but notice that August 23, 1978 conveniently places Colan's suit within § 16(b)'s two-year statute of limitations. Had Colan alleged that a § 16(b) sale occurred before August 5, 1978, such as on the date that the Boards of Eaton and Cutler-Hammer approved the merger agreement (June 26, 1978), his suit would

have been barred by that statute of limitations.

On a motion for summary judgment, a court is not required to evaluate every conceivable inference which can be drawn from the evidence, but only reasonable inferences. *Matthews v. Allis-Chalmers*, 769 F.2d 1215, 1218 (7th Cir.1985). The court now finds that Colan has failed to present evidence from which this court may reasonably infer that, on August 23, 1978, Koppers and Eaton reached a secret agreement to delay the date of the merger in order to protect Koppers from any § 16(b) liability.

## V. The Existence of a "Sale" Under § 16(b)

Even were the court to assume that Eaton and Koppers secretly agreed to defer the merger on August 23, 1978, this agreement would not constitute a "sale" under § 16(b). The Seventh Circuit's recent opinion in *Portnoy v. Revlon, Inc.*, 650 F.2d 895 (7th Cir.1981), makes this clear.

In *Revlon*, the Seventh Circuit addressed the exact question before this court, whether there was a "sale" of stock within the meaning of § 16(b). In that case, plaintiff Portnoy sued on behalf of Revlon, the surviving corporation in the merger of Revlon and Barnes-Hind Pharmaceuticals, Inc. Portnoy contended that Cooper Laboratories, Inc. realized short-swing profits upon the purchase and exchange of Barnes-Hind stock in 1976. Cooper began purchasing Barnes-Hind common stock in 1972. In 1974, Barnes-Hind concluded that a combination with Cooper would not be in the best interests of Barnes-Hind or its shareholders. Cooper continued to purchase Barnes-Hind stock through May, 1976. On May 26, 1976, Barnes-Hind sued Cooper in federal court to enjoin Cooper from making any further purchases of Barnes-Hind stock. The court denied Barnes-Hind's request for a temporary restraining order,

16. *See, e.g.,* Exhibit "27" to Koppers' Memorandum at 18.

17. *See* Exhibit "A.2" to Colan's Memorandum at 58; Exhibit "14" to Koppers' Memorandum at 124; Colan's Memorandum at 29.

18. *See* Colan's Memorandum at 19.

and shortly thereafter, Barnes-Hind and Revlon executed a Letter of Intent to merge which set forth the procedure for, and prerequisites to, the execution of a formal merger agreement. At that time, Cooper agreed to support the merger.[19] On July 29, 1976, Barnes-Hind and Revlon executed the Merger Agreement which set forth the conditions precedent to the merger. The conditions were satisfied, the merger closed, and the shares exchanged on December 31, 1976.

In his complaint, Portnoy alleged that either the Letter of Intent or the Merger Agreement constituted a § 16(b) "sale." According to Portnoy, because Cooper pledged its stock in support of the Revlon merger, and because the conditions precedent to the closing of the merger were beyond the control of Cooper and required no action on the part of Cooper, Cooper was "irrevocably bound" to exchange its Barnes-Hind stock for Revlon stock no later than July 29, 1976. Therefore, a § 16(b) "sale" occurred no later than July 29, 1976, well within six months of Cooper's May, 1976 purchases of Barnes-Hind stock.

The Seventh Circuit held that neither the Letter of Intent nor the Merger Agreement constituted a contract to sell shares within the scope of § 16(b). In so holding, the court reasoned that a sale occurs when an insider becomes "so irrevocably bound to dispose of his securities so that his rights and obligations [become] fixed and the opportunity for speculative abuse [is] removed." *Revlon*, 650 F.2d at 898. The court found that the Letter of Intent and the Merger Agreement did not irrevocably bind Cooper to exchange its Barnes-Hind stock because (1) Cooper retained the right to unilaterally dispose of its Barnes-Hind shares to unrelated third parties, continuing the potential for speculative trading by

an insider, until the merger closed; and (2) the significant conditions precedent to the merger set out in the Merger Agreement were not fulfilled until December, 1976, and nonfulfillment of any of the conditions could have blocked the consummation of the merger.

As in *Revlon*, assuming there was a secret agreement, this agreement did not constitute a "sale" by Koppers of its Cutler-Hammer shares, in the sense of an irrevocable commitment and a fixing of Kopper's rights and obligations. Until January 2, 1979, the date the merger closed, despite the alleged secret agreement, Koppers retained the right to dispose of its Cutler-Hammer stock to unrelated third parties. Also, the significant conditions precedent to the closing were not fulfilled until long after August 23, 1978.

Koppers retained its speculative position as a Cutler-Hammer insider despite the alleged secret agreement to sell its Cutler-Hammer stock to Eaton at the merger closing. In all relevant respects, the alleged secret agreement can be equated with a formal option agreement, which, until exercised, does not constitute a sale, unless the option carries with it rights of ownership. *Colan v. Monumental Corp.*, 713 F.2d 330, 334 (7th Cir.1983); *Revlon*, 650 F.2d at 901; *Bershad v. McDonough*, 428 F.2d 693 (7th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971). Unlike the alleged insider in *Bershad*, Koppers did not agree to place the stock in escrow pending the closing of the merger, or grant Eaton an irrevocable proxy to vote the stock effective immediately. Instead, Koppers retained all the rights of stock ownership until the January 2, 1979 merger closing. Therefore, Koppers retained its right to sell the stock to third parties, and its alleged agreement to sell its Cutler-Ham-

---

**19.** Cooper expressed its approval of the merger in three separate documents: (1) an addendum to the Letter of Intent stating that Cooper consented to Barnes-Hind entering into the Letter of Intent; (2) an "Agreement as to Voting" stating that Cooper would present its Barnes-Hind shares at any shareholders' meeting and would vote in favor of the proposed Revlon acquisition; and (3) a letter to Revlon stating that Cooper would not acquire any additional shares of Barnes-Hind or negotiate with third parties for the sale of the business, assets, or all of the shares of Barnes-Hind. *Revlon*, 650 F.2d at 899.

mer stock to Eaton at the merger closing did not constitute a § 16(b) sale.[20]

In addition, it is clear that the significant conditions precedent to the merger "did not become definitely eliminated" until long after August 23, 1978. *Colan v. Brunswick Corp.*, 550 F.Supp. 49, 51–52 (N.D.Ill.1982). Colan bears the burden of establishing that all significant conditions precedent to the merger were fulfilled within six months of Koppers' purchase of Cutler-Hammer stock. *Revlon*, 650 F.2d at 898. The court now finds that Colan has failed to meet this burden.

The Merger Agreement of June 26, 1978 states that the consummation of the merger was subject to the following significant conditions: (1) lack of litigation with regard to the merger; (2) Cutler-Hammer shareholders' approval of the Merger Agreement at a meeting, the date of which was to be set under Section II of the Merger Agreement; (3) an S.E.C. order declaring effective the necessary Eaton Registration Statement; (4) F.T.C. antitrust clearance of the merger; and (5) the certificate and opinion of Cutler-Hammer's President and Counsel, respectively, to be issued after the shareholders' meeting.[21]

Colan asserts that the requirement that there be no litigation with regard to the merger may not be considered a significant condition precedent to the merger because of Magistrate Lefkow's discovery ruling of September 22, 1983.[22] In that order, Magistrate Lefkow determined the applicability of the attorney-client and work product privileges to a large number of documents. Colan argued that Koppers had waived the attorney-client privilege with respect to certain documents by placing attorney advice at issue. Koppers placed attorney advice at issue, Colan contended, by raising the defense that the threat of litigation was a significant condition precedent to the consummation of the merger. Magistrate Lefkow upheld Koppers' assertion that it had not waived the attorney-client privilege with respect to these documents, because it had not made the advice of counsel the critical issue in the suit. Magistrate Lefkow found that, because Koppers did not raise the threat of litigation as an affirmative defense in its answer, Koppers had not put advice of counsel in issue. Magistrate Lefkow concluded, however, that, by upholding the privilege, the court considered Koppers barred from asserting the threat of litigation as a defense.

Koppers asserts in its motion for summary judgment that the alleged secret agreement was not a § 16(b) sale because, *inter alia*, the significant conditions precedent to the merger, including the lack of litigation, were not fulfilled within six months of the purchase of stock. However, Koppers is not thereby raising the threat of litigation as an affirmative defense, which Koppers would then have the burden of proving. Rather, Cutler-Hammer and Eaton made lack of litigation concerning the merger a condition precedent to the merger; thus, under § 16(b), Colan has the burden of establishing that this condition was met within six months of Koppers' purchase of stock.

Colan has not met its burden of establishing that the threat of litigation was not a significant condition precedent to the closing of the merger. Colan asserts that "[a] review of the testimony of the principal negotiators for the investment banking firms confirms the litigation issue was resolved between the parties long before August 23, 1978." Colan refers to notes of Robert Brown allegedly evidencing an agreement between Lehman Brothers and First Boston under which neither would sue the other without notifying the other in advance.

**20.** Koppers retained its speculative position as a Cutler-Hammer insider, not only because the secret agreement did not carry with it rights of ownership, but also because the alleged agreement was an oral agreement, and was therefore unenforceable under both the Ohio and Pennsylvania Commercial Codes. *See* Ohio Rev. Code Ann. § 1308.34 (1985 Supp.); 13 Pa.Cons. Stat. § 8319.

**21.** *See* Exhibit "13" to Koppers' Memorandum at 268, 283–90.

**22.** *See* Exhibit "K" to Koppers' Reply Memorandum.

Koppers concedes that Lehman Brothers and First Boston did agree to notify each other before initiating litigation.[23] However, Koppers contends, and the court now finds, that this was the extent of the agreement; Eaton and Lehman Brothers recognized that Koppers could initiate litigation through December of 1978.[24] Moreover, third parties could have also initiated litigation that could have prevented or delayed the merger.

Colan also asserts that the requirement that the Cutler-Hammer Board set a date for a shareholders' meeting, and that the shareholders vote to approve or disapprove the Merger Agreement, was fulfilled on August 23, 1978. On that date, the Cutler-Hammer Board set the meeting for October 2, 1978, but gave Fitzgerald the authority to change the date without further Board action. Fitzgerald, on October 20, 1978, set the meeting for December 14, 1978. According to Colan, because Fitzgerald was a Koppers director, on August 23, 1978, when he was given the authority to set the date for the shareholders' meeting, Fitzgerald became bound to protect Koppers' interests and to set the date beyond six months from Koppers' last purchase of Cutler-Hammer stock.

However, the court finds that, on August 23, 1978, Fitzgerald was not irrevocably bound to reschedule the date of the shareholders' meeting in order to protect Koppers from § 16(b) liability. Fitzgerald and DeWindt both testified under oath in their depositions that other factors, such as a favorable capital gains tax law change effective January 1, 1979, and the ability of Eaton and Cutler-Hammer to work out financial and legal matters, affected Fitzgerald's decision to postpone the shareholders' meeting, and Eaton's tacit approval of the postponement.[25] In any event, the shareholders' meeting was not scheduled until October 20, 1978, and the shareholders did not approve the Merger Agreement until the December 14, 1978 meeting. Thus, this condition was not fulfilled on August 23, 1978.

In addition, Colan argues that the S.E.C. approval of Eaton's Registration Statement and the F.T.C. antitrust clearance were not significant conditions precedent to the merger. Colan contends that the approval of the S.E.C. and F.T.C. clearance were not significant because Eaton was a "sophisticated filer," the "boiler plate" terms and conditions of the merger presented no stumbling block to the consummation of the merger, and, in fact, the F.T.C. and Department of Justice inquiries were "mere technicalities." However, the fact remains that the S.E.C. did not declare Eaton's Registration Statement effective until November 3, 1978, and Eaton did not consider that it had F.T.C. approval of the merger until December 14, 1978. Despite Colan's conclusory contention that the S.E.C. and F.T.C. approvals were mere technicalities, under the Merger Agreement, approval from both of these agencies was an actual precondition to the merger and could not be assumed. *See supra* nn. 4–5. Had Eaton and Cutler-Hammer failed to secure approval from the S.E.C. or F.T.C., either party would have had the right to withdraw from the merger. Therefore, the court finds these conditions significant, and not fulfilled as of August 23, 1978.

Finally, Colan argues that the opinion of Cutler-Hammer's counsel and the certificate of its president were not significant conditions precedent to the merger, but "merely technical conditions capable of ready completion and without any discernible impediment to their issuance." Also, Colan argues that these conditions are insignificant because Eaton had the ability to waive these conditions, and there is no reason to infer why Eaton would not have readily waived these conditions had they been barriers to a closing. Again, these conclusory statements made with 20/20 hindsight fly in the face of reality. Despite

**23.** *See* Koppers' Reply.Memorandum at 54–55.

**24.** *See* Exhibit "D" to Koppers' Reply Memorandum at 23, 56.

**25.** *See* Exhibit "2" to Koppers' Memorandum at 58–59; Exhibit "25" to Koppers' Memorandum at 45–48, 53.

Colan's contention that these conditions were insignificant, it is clear they are not. The Merger Agreement expressly conditioned consummation of the merger upon the fulfillment of these conditions, and Eaton at no time waived these requirements. Therefore, these conditions were significant conditions precedent to the merger, and they were not fulfilled until January 2, 1979.

In summary, the court finds that, even if one assumes for the sake of argument that there was a secret agreement between Eaton and Koppers to delay the merger, Koppers retained its speculative position as a Cutler-Hammer insider, and the significant conditions precedent to the merger were not all fulfilled, until the merger closed on January 2, 1979. Koppers was not irrevocably bound to dispose of its Cutler-Hammer shares, with rights and obligations fixed, until that date. Koppers never signed a contract to sell the shares to Eaton, never tendered the shares to Eaton, never pledged its support for the merger or agreed to vote its shares in favor of the merger, and Koppers was not a party to the Eaton/Cutler-Hammer Merger Agreement. In addition, Koppers might have blocked or at least substantially delayed the merger by demanding a class vote of its 10,000 preferred shares.[26] Therefore, even if there were a secret agreement to delay the merger, no § 16(b) sale occurred before January 2, 1978, the date the merger closed.

## IV. CONCLUSION

For the reasons set forth above, the court grants Koppers' motion for summary judgment, denies Koppers' motion to strike, and denies Colan's motion for a pretrial order, pretrial conference and trial schedule.

Dated: May 23, 1986

---

**26.** Colan argues that Koppers did not have the right to vote its 10,000 preferred shares as a class. Colan points to the fact that Cutler-Hammer did not issue Koppers a proxy for its convertible preferred stock before the vote with regard to the merger. Colan also points to the letter of Frank Pelisek, Cutler-Hammer's counsel, to the S.E.C. regarding the class voting rights of Koppers' convertible preferred stock. See Exhibit "A.44" to Colan's Memorandum. In addition, Colan contends that Cutler-Hammer's charter and its amendments do not provide for the issuance of preferred stock with class voting rights.

Koppers contends that it did have the right to vote its preferred shares as a class, pursuant to the Cutler-Hammer Resolution of April 8, 1978. That Resolution provided that preferred stockholders have the right to vote as a class, as provided by the applicable laws of the State of Delaware, and by the certificate of incorporation of the corporation. Cutler-Hammer's certificate of incorporation gives its Board of Directors the authority to fix the voting rights of preferred shares by resolution to the full extent permitted by the laws of the State of Delaware. See Exhibit "A.55" to Colan's Memorandum at 262, 269. Section 151 of Delaware's General Corporation Law, 8 Del.Laws § 151 (1986), provides that every corporation may create classes of stock with such voting powers as are stated in the certificate of incorporation or in the resolution, adopted by the board of directors pursuant to authority vested in it by the articles of incorporation, providing for the issue of stock. Therefore, neither Cutler-Hammer's certificate of incorporation, nor Delaware's corporate law, prohibit the issuance of a preferred class of stock with the right to vote as a class established in the resolution creating the stock. Consequently, the court finds that, either Koppers did have the right to vote its preferred stock as a class, or, at least, Koppers could have delayed the merger by asserting its right to vote the preferred stock as a class, through litigation or otherwise.