**Lloyd PAYNE, et al., Plaintiffs,**

**v.**

**James A. COLLINS, et al., Defendants.**

**No. 9:95CV413 (TH).**

United States District Court,
E.D. Texas,
Lufkin Division.

June 25, 1997.

Reich Chandler, Darrin Walker, Lufkin, TX, Don Tittle, Dallas, TX, for Plaintiffs.

Philip Marrus, Austin, TX, for Defendants.

### *MEMORANDUM OPINION*

HEARTFIELD, District Judge.

 1. Plaintiffs, Lloyd and Vina Payne (the Paynes), sue defendants, James A. Collins, Wayne Scott, Keith Price and Essie Johnson, all of whom are former or current Texas Department of Criminal Justice (TDCJ) officials, individually under Section 1983 of Title 42 to the United States Code (Section 1983)[1] for failing to protect their son, Randy Payne, in violation of the Eighth Amendment to the United States Constitution.[2] Pls.' Second Am. Compl. and Req. for Jury; Pls.' Resp. to Defs.' Mot. for Summ. J. [hereinafter Resp.].

2. Collins, Scott, Price and Johnson move for summary judgment. They initially argue that this case's record fails to establish them as liable for any Eighth Amendment breach. They then contend that, even if they committed constitutional violations, they should receive qualified immunity.[3] Mot.; Defs.' Re-

---

1. "Section 1983 provides a remedy against 'any person' who, under color of state law, deprives another of rights protected by the Constitution." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992). "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates." *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir.1989).

2. The Fourteenth Amendment's due process clause brings state officials, such as defendants, within the Eighth Amendment's ambit. *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962); *see also Hill*

*v. Godinez*, 955 F.Supp. 945, 949 n. 2 (N.D.Ill. 1997).

3. The summary judgment motion's organization parallels the manner in which an interlocutory appeal of a decision to deny a request for qualified immunity is reviewed. *Compare* Defs.' Mot. for Summ.J. and Br. in Supp. at 11 [hereinafter Mot.] *with White v. Taylor*, 959 F.2d 539, 545 n. 4 (5th Cir.1992) (*Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991), "require[s] ... examin[ation] of whether the plaintiff has stated a claim for a constitutional violation before reaching the issue of qualified immunity"). *See generally Ganther v. Ingle*, 75 F.3d 207, 210–11 (5th Cir.1996).

ply to Pls.' Resp. to Defs.' Mot. for Summ. J. [hereinafter Reply].

3. The court grants the motion for summary judgment [62] in part and denies it in part.

### SUMMARY JUDGMENT STANDARD

4. "Federal Rule of Civil Procedure 56(c) provides that a grant of summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Pollock v. Federal Deposit Ins. Corp.*, 17 F.3d 798, 803 (5th Cir.1994). "The mere existence of a factual dispute does not by itself preclude the granting of summary judgment. '[T]he requirement is that there be no *genuine* issue of *material* fact.'" *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir.1987). "The substantive law ... identif[ies] which facts are material." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *see Texas Manufactured Hous. Ass'n, Inc. v. City of Nederland*, 101 F.3d 1095, 1099 (5th Cir.1996) ("A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."), *cert. denied*, —— U.S. ——, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). "There is no genuine issue of material fact if the evidence is such that, drawing all reasonable inferences in favor of the nonmovant, ... a reasonable jury could not return a verdict in his [or her] favor."[4] *Atkinson v. Denton Pub. Co.*, 84 F.3d 144, 148 (5th Cir.1996); *see Texas Manufactured Hous. Ass'n*, 101 F.3d at 1099 ("An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.").

5. The operation of the summary judgment standard varies. *See International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–65 (5th Cir.1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). For example, in this suit, the framework

associated with "run-of-the-mill civil cases" guides analysis of the direct challenges to the Paynes' Eighth Amendment claims, while a another approach informs consideration of the assertions of qualified immunity. A difference in where the burden of proof is placed in an Eighth Amendment claim and in a qualified immunity defense explains this circumstance. *Compare infra* ¶ 33 (disclosing that the plaintiff alone bears the burden of proof on an Eighth Amendment claim brought under Section 1983) *with Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir.1992) (describing the "shifting burden of proof" for qualified immunity).

### Application of the Summary Judgment Standard When the Movant–Defendant Challenges Constitutional Claims: The "Run-of-the-Mill" Civil Case Approach

6. "In the 'run-of-the-mill' civil case, [such as one alleging an Eighth Amendment violation brought under Section 1983,] the defendant moves for summary judgment on the ground that the evidence in the record demonstrates that it is entitled to a judgment as a matter of law—that should the case proceed to trial, the plaintiff will not sustain its burden of proof and the court will necessarily direct a verdict in its favor." *International Shortstop*, 939 F.2d at 1264. To show that the evidence mandates summary judgment in its favor, the defendant either "affirmatively offer[s] evidence which undermines one of the essential elements of the plaintiff's case; or, ... simply demonstrate[s] that the evidence in the record falls short of establishing an essential element of the plaintiff's case,"[5] *id.; see Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.) (party moving for summary judgment carries its burden "by informing the court of the basis for its motion, and by identifying portions of the record which highlight the absence of genuine factual issues"), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). When

---

4. The summary judgment rule "'mirrors' the standard for a [judgment as a matter of law] under Fed.R.Civ.P. 50(a)." *St. Amant*, 806 F.2d at 1297; *see also infra* note 6.

5. "Under [the] ... latter option, the defendant need not produce evidence of its own because it is the plaintiff that will bear the burden of proof at trial." *International Shortstop*, 939 F.2d at 1264.

the defendant makes a properly supported motion for summary judgment, the plaintiff "must bring forward ... 'significant probative evidence'" to create a genuine issue of material fact.[6] *Gutterman*, 896 F.2d at 118; *accord Texas Manufactured Hous. Ass'n*, 101 F.3d at 1099. It "need not offer all of the evidence tending to support its case, only enough evidence from which a jury might return a verdict in [its] favor." *International Shortstop*, 939 F.2d at 1264. It "can satisfy [this] ... burden by tendering depositions, affidavits or other competent evidence," *Topalian*, 954 F.2d at 1132, or "by referring to evidentiary documents already in the record," *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990), *cert. denied*, 510 U.S. 859, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993).[7] *Accord International Shortstop*, 939 F.2d at 1263–64. The plaintiff's showing, however, "must [raise] ... more than a metaphysical doubt about the material facts," *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123 (5th Cir.1988), and must constitute more than a "mere scintilla of evidence," *Spiller v. Ella Smithers Geriatric Ctr.*, 919 F.2d 339, 343 (5th Cir.1990). Moreover, the plaintiff cannot elude the defendant's properly supported summary judgment motion by presenting "conclusory allegations, improbable inferences, and unsupported speculation,"[8] *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1439 (5th Cir.1993); *accord Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985) ("In fact, unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."); *see Grimes v. Texas Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 139 (5th Cir.1996) ("Needless to say, unsubstantiated assertions are not competent summary judgment evidence."), or by "claim[ing] that further discovery or a trial might reveal facts [of] which [it] ... is currently unaware," *Armstrong Indus.*, 839 F.2d at 1123. When the plaintiff fails to meet its evidentiary burden, entry of summary judgment for the defendant results. *Topalian*, 954 F.2d at 1131; *Fields v. City of South Houston, Tex.*, 922 F.2d 1183, 1187 (5th Cir.1991); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir.1986); *see Little*, 37 F.3d at 1075 (When the nonmovant provides no evidence to create a genuine issue of material fact, the court "*do[es] not ... assume that the nonmovant could or would prove the necessary facts.*" Rather, it enters summary judgment for the movant.).

### Application of the Summary Judgment Standard When the Movant–Defendant Asserts Qualified Immunity

■ 7. "Public officials whose positions entail the exercise of discretion enjoy the defense of qualified immunity in § 1983 actions." *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir.1987). "In essence, qualified immu-

**6.** Significant probative evidence "may be equated with the 'substantial evidence' standard used to determine whether a [judgment as a matter of law] is appropriate." *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990); *see also Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1444 (5th Cir.1990).

**7.** "Rule 56, therefore, saddles the [plaintiff] ... with the duty to 'designate' the specific facts in the record that create genuine issues precluding summary judgment, and does not impose upon the district court a duty to survey the entire record in search of evidence to support [the plaintiff's] ... opposition." *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir.1996); *see Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir.1996) ("Rule 56 clearly permits a court to consider the whole record, and 'not just the portion highlighted by the motion.' Moreover, a district judge is not compelled to limit the basis for a summary judgment on those facts listed in the motion for summary judgment. In essence, a district court has the ability to grant a summary judgment on facts not briefed by the [defendant] ..., as long as the [plaintiff] ... has notice of the issue.").

**8.** The principle that the plaintiff may not rely upon "conclusory allegations, improbable inferences, and unsupported speculation" unquestionably applies to cases where state of mind is at issue. *See International Shortstop*, 939 F.2d at 1266; *see also Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1326 (5th Cir.1996); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075–76 & n. 14 (5th Cir.1994) (en banc). In those cases, the plaintiff must present "affirmative evidence ... which would allow for the reasonable inference that the [defendant] ... acted with a contrary state of mind." *International Shortstop*, 939 F.2d at 1266.

nity 'reconcile[s] two competing interests. One interest is the compensation of persons whose federally protected rights have been violated. Opposing this is the fear that personal liability will inhibit public officials in the discharge of their duties.'" *Caffey v. Johnson,* 883 F.Supp. 128, 132 (E.D.Tex. 1995) (quoting *Johnston v. City Houston,* 14 F.3d 1056, 1059 (5th Cir.1994)).

■ 8. The question of "[w]hether [or not] a defendant [government official] asserting qualified immunity may be personally liable turns on the objective legal reasonableness of [his or her] ... actions assessed in light of clearly established law." *Pfannstiel v. City of Marion,* 918 F.2d 1178, 1183 (5th Cir.1990).

> [Under this standard,] the [defendant's] ... conduct is measured with reference to the law as it existed at the time of the conduct in question. Therefore, the right the [defendant] ... is alleged to have violated must have been clearly established at the time of the occurrence. The contours of the right must be sufficiently clear so that a reasonable official would understand that what he [or she] is doing violates that right. If, upon viewing the evidence in the light most favorable to the [plaintiff] ..., reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity.

*Harper v. Harris County, Tex.,* 21 F.3d 597, 600 (5th Cir.1994); *accord Spann v. Rainey,* 987 F.2d 1110, 1114 (5th Cir.1993) ("The contour, or standard, for a constitutional right may expand after the time of the alleged violation; but as stated, the benchmark for objective reasonableness is that which existed at the time of the alleged violation— we look to clearly established law at that time.").

■ 9. No hard and fast rule defines the body of law to consult to determine if a constitutional right was clearly established when the purported wrong occurred. *Me-*

*lear v. Spears,* 862 F.2d 1177, 1184 n. 8 (5th Cir.1989).

> Relying solely on Fifth Circuit and Supreme Court cases, for example, [is] ... excessively formalistic, but they [do] ... loom largest in [a court's] ... inquiries. In determining what the relevant law is, then, a court must necessarily exercise some discretion in determining the relevance of particular law under the facts and circumstances of each case, looking at such factors as the overall weight of authority, and the status of the courts that render substantively relevant decisions, as well as the jurisdiction of the courts that render substantively relevant decisions.

*Id.; see Boddie v. City of Columbus, Miss.,* 989 F.2d 745, 748 (5th Cir.1993) ("Our inquiry ends, if we find from examining the decisions of the Supreme Court and our own decisions that the law was clearly established in this circuit."). Moreover, a right may have been clearly established at the time of the events at issue "even if the 'very action in question' had not then been held to be a constitutional violation." *Foster v. City of Lake Jackson,* 28 F.3d 425, 429 (5th Cir. 1994); *accord Doe v. Taylor Indep. Sch. Dist.,* 15 F.3d 443, 455 (5th Cir.) ("The term 'clearly established' does not necessarily refer to 'commanding precedent' that is 'factually on all-fours with the case at bar,' or that holds the 'very action in question' unlawful. Rather, a constitutional right is clearly established if 'in light of pre-existing law the unlawfulness [is] apparent.' Put another way, officials must observe 'general well-developed legal principles.'"), *cert. denied,* 513 U.S. 815, 115 S.Ct. 70, 130 L.Ed.2d 25 (1994).

■ 10. When the defendant moves for summary judgment based on qualified immunity, he or she first must "plead[ ] his [or her] good faith and establish that he [or she] was acting within the scope of his [or her] discretionary authority when the alleged wrongful acts occurred." [9] *Saldana v. Garza,* 684 F.2d 1159, 1163 & n. 14 (5th

---

9. The defendant "acts within his [or her] discretionary authority when he [or she] performs non-ministerial acts within the boundaries of his [or her] official capacity." *Cronen v. Texas Dep't of Human Servs.,* 977 F.2d 934, 939 (5th Cir.1992);

*see Sampson v. King,* 693 F.2d 566, 569 (5th Cir.1982) ("Qualified immunity can only exist where the defendant official is required to exercise some modicum of official discretion.").

Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983); *see Blackwell v. Barton,* 34 F.3d 298, 301 (5th Cir. 1994); *Gunn v. Manning,* No. 3:95–CV–2831–AH, 1997 WL 30900, at *1 (N.D.Tex. Jan.16, 1997); *see also Coleman ex rel. Ray v. Rance,* No. CIV.A. 4:96CV21–D–B, 1997 WL 170316, at *3 n. 3 (N.D.Miss. Mar.24, 1997) ("the defendants cannot merely enter the courthouse and cry 'immunity' and expect to receive it until they demonstrate to the court that they are in fact entitled to its protection by presenting this court with supporting summary judgment evidence"); *Wright v. Reynolds,* 703 F.Supp. 583, 588 (N.D.Tex.1988) (the defendant will "present[ ] evidence support[ing] his [or her] claim of qualified immunity"). If he or she does so, then the plaintiff must "come forward with summary judgment evidence sufficient to sustain a determination that [the defendant's] ... actions violated clearly established law." *Blackwell,* 34 F.3d at 301; *accord Gunn,* 1997 WL 30900, at *1; *see McCoy v. Montgomery County,* Civ.A. No. H–84–1756, 1987 WL 14372, at *2 (S.D.Tex. June 15, 1987) (assertion of qualified immunity and undisputed fact that the defendants had acted pursuant to their discretionary authority shifted the summary judgment burden to the plaintiffs), *aff'd* 866 F.2d 1419 (5th Cir.1989). In other words, the plaintiff must provide significant probative evidence showing that the defendant acted in an objectively unreasonable manner in light of a constitutional right clearly established at the time of the purported wrong. *See Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1305 (5th Cir.1995), *cert. denied,* 517 U.S. 1191, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996). If he or she fails to meet this burden, then entry of summary judgment for the defendant based on qualified immunity occurs. *See Saldana,* 684 F.2d at 1164.

### Summary Judgment Evidence

11. "[T]he pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits submitted in support [of] or in opposition to the motion [usually] constitute the summary judgment record." *Kelley v. Price–Macemon, Inc.,* 992 F.2d 1408, 1415 n. 12 (5th Cir.1993), *cert. denied,* 510 U.S. 1043, 114 S.Ct. 688, 126 L.Ed.2d 656 (1994). However, these "forms of evidence ... are not the exclusive ways for presenting evidence in a [summary judgment] ... proceeding." *Duffee ex rel. Thornton v. Murray Ohio Mfg. Co.,* 160 F.R.D. 602, 604 (D.Kan. 1995). Anything that "[is] ... included in the pretrial record and that would [be] ... admissible evidence" may receive consideration.[10] *Fowler,* 68 F.3d at 126; *see Gauck v. Meleski,* 346 F.2d 433, 436 (5th Cir.1965). This principle allows submission of a wide variety of materials, including stipulations, *Munoz v. International Alliance of Theatrical Stage Employees & Moving Picture Mach. Operators of U.S. and Canada,* 563 F.2d 205, 207 (5th Cir.1977); *Swallow Turn Music v. Wilson,* 831 F.Supp. 575, 577–78 (E.D.Tex.1993), certified transcripts of judicial proceedings, *Kelley,* 992 F.2d at 1415 n. 12; *see Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1182 (9th Cir.1988), a court's own records and files, *Aloe Creme Labs., Inc. v. Francine Co.,* 425 F.2d 1295, 1296 (5th Cir.1970); *see* Fed.R.Evid. 201, and orders by other courts, *Colonial Leas. Co. v. Logistics Control Group Int'l,* 762 F.2d 454, 459 (5th Cir.1985); *see* Fed.R.Evid. 201; *Opoka v. Immigration and Naturalization Serv.,* 94 F.3d 392, 394 (7th Cir.1996) ("it is a well-settled principle that the decision of another court or agency ... is a proper subject of judicial notice").

12. Although it may consider many forms of evidence in reviewing a summary judgment motion, a court must refrain from "evaluat[ing] the credibility of the witnesses, weigh[ing] the evidence, or resolv[ing] factual disputes." *International Shortstop,* 939 F.2d at 1263. "[S]o long as the evidence ... is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, [it]

---

10. "The admissibility of summary judgment evidence is subject to the same rules of admissibility applicable at trial." *Resolution Trust Corp. v. Starkey,* 41 F.3d 1018, 1024 (5th Cir.1995); *see*

*Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir.1995) ("Evidence on summary judgment may be considered to the extent not based on hearsay or other information excludable at trial.").

... must deny the [summary judgment] motion." *Id.*

## FACTUAL BACKGROUND

### Terrell Unit: Architectural Design

13. The Terrell Unit, a maximum security prison operated by the TDCJ's Institutional Division (TDCJ–ID),[11] Price Aff. I ¶ 3; Price Aff. II ¶ 3, includes housing for inmates exhibiting the most violent tendencies, who are classified as "close custody," Resp. (Pl.'s Ex. B (Affidavit of Alex Torres at 1 [hereinafter Torres Aff.] )); *see* Resp. (Pl.'s Ex. E (Videotaped Dep. of Joseph Keith Price at 67–68 [hereinafter Price Dep.] )).

14. Many of the events relevant to this case occurred on August 5, 1994, in the Terrell Unit's 7 Building, which, along with its 8 Building, quarters close custody prisoners, Price Aff. I ¶¶ 5, 6; Price Aff. II ¶¶ 5, 6; *see* Price Aff. I ¶ 8. The 7 Building divides into three Pods (Pods A, B and C). Each Pod divides into three Sections (Sections A, B and C). Three levels of eight two-man cells (Rows 1, 2 and 3) are in each Section. A stairway connects the levels. A walkway runs around the shower area and in front of the cells on each level. On the ground floor of each Section is a dayroom, which serves as a commons area for the inmates. Price Aff. I ¶¶ 5–6; Price Aff. II ¶¶ 5–6; *see* Resp. (Pl.'s Ex. A (Aff. of W. Ken Katsaris ¶ 2 [hereinafter Katsaris Aff.] )).

15. The three Sections in a Pod surround a two-story guard tower. The guard tower's second floor is a glass-enclosed control booth housing electronic controls for all cell doors in the Pod, for the doors connecting the Pod's Sections to each other and for the doors providing entry to and exit from the Pod. The control room also has a telephone and an intercom linked to intercoms located throughout the Pod. Mot. (Ex. 2 (Aff. of Essie Johnson ¶ 3 [hereinafter Johnson Aff. ] )); *see* Price Aff. I ¶¶ 20–21; *see also* Johnson Aff. ¶ 14. The Correctional Officer (CO) manning the control room can see nearly all areas of each Section. *See* Katsaris Aff. ¶ 2; Torres Aff. at 1–2. He or she may not leave his or her post except to use a bathroom located on the guard tower's first floor. Johnson Aff. ¶ 5.

### Stipulations

16. Stipulations entered in two lawsuits, *Ruiz v. Estelle*[12] and *Lamar v. Coffield,*[13]

---

**11.** The Terrell Unit opened in either November of 1992 or November of 1993. *Compare* Mot. (Ex. 3 (Aff. of Keith Price ¶ 3 [hereinafter Price Aff. I] )) *and* Reply (Ex. 1 (Aff. of Keith Price ¶ 3 [hereinafter Price Aff. II] )) *with* Price Aff. I ¶ 23.

**12.** *Ruiz* resulted in the entry of "an extensive remedial decree, setting forth in considerable detail, the actions of [the Texas Department of Corrections, the TDCJ–ID's predecessor,] ... to remedy ... constitutional defects in its prisons. The provisions of the remedial decree [were] ... modified substantially, either by the [United States Court of Appeals for the] Fifth Circuit, or by the parties themselves in the form of stipulated modifications." *Green v. McKaskle,* 788 F.2d 1116, 1122 (5th Cir.1986). Modification of the Stipulation entered in *Ruiz* relevant to this case requires the approval of United States District Judge William Wayne Justice. *See Ruiz v. Procunier,* Civil Action No. H–78–987–CA (S.D.Tex.1985) [hereinafter *Ruiz* Stipulation] (Stipulation Modifying Crowding Provisions of Am. Decree at 32 ("Any party at any time may seek, by appropriate motion, to modify the provisions of this stipulation.")). *But see infra* note 36. *See generally* Frank R. Kemerer, *William Wayne Justice* 356–400 (1991) (providing a history of the *Ruiz* litigation).

**13.** *Lamar* resulted in the permanent enjoinment of Texas "from racially segregating inmate housing and facilities, unless an objective assessment show[s] that integration for a particular prisoner would pose a high likelihood of danger to him or others." *Lamar v. Coffield,* 951 F.Supp. 629, 630 (S.D.Tex.1996). *See generally Williams v. Treen,* 671 F.2d 892, 902 (5th Cir.1982) (reporting the clear establishment of "the right to be free from general policies of racial segregation in prison housing and administration"), *cert. denied,* 459 U.S. 1126, 103 S.Ct. 762, 74 L.Ed.2d 977 (1983). United States District Judge Lynn Hughes, who oversees *Lamar,* recently ruled that "[m]otions to modify the [consent] decree [enjoining Texas from racial segregation in inmate housing and facilities], to exempt individuals from it, or to intervene by individuals dissatisfied with desegregation will be denied routinely." *Lamar,* 951 F.Supp. at 630. In doing so, he stated the following:

> The court is wary of being seen to test the resolve of inmates who announce that their hate will make them violently disposed to other races if they are locked together. No amount of violence, large or small, to prove one's eligibility for a single-race cell will be rewarded by the state or by this court. An inmate who proves that he is both a bigot and violent will

govern certain aspects of the Terrell Unit's operations. They equate with consent decrees. *See Ruiz v. McCotter*, 661 F.Supp. 112, 117 & n. 7 (S.D.Tex.1986).

17. The following portion of the *Ruiz* Stipulation pertains to this litigation: "During the hours the dayroom [in a cellblock] may be used, the doors from the dormitory to the dayroom shall remain unlocked and prisoners shall be permitted free access to and from the dayroom." *Ruiz v. Procunier*, Civil Action No. H–78–987–CA (S.D.Tex. 1985) [hereinafter *Ruiz* Stipulation] (Stipulation Modifying Crowding Provisions of Am. Decree at 12); Price Aff. II ¶ 8 (reporting that the *Ruiz* Stipulation dictated the Terrell Unit's policy on inmate access to dayroom areas). *See generally McGill v. Duckworth*, 944 F.2d 344, 348 (7th Cir.1991) (recognizing that "lock[ing prisoners] in their cells 24 hours a day ... pos[es] constitutional problems of its own" (parentheses omitted)), *cert. denied*, 503 U.S. 907, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992).

18. The Stipulation in *Lamar* relates to this case insofar as it has prompted development of a cell assignment procedure at the Terrell Unit that seeks to "fulfill the mission of achieving racial/ethnic balancing of inmates and the avoidance of racial segregation in close custody areas." Mot. (Ex. 5 (Aff. Denicia Jefferson at 1 [hereinafter Jefferson Aff.] )). *Compare* Price Aff. I ¶¶ 10–12 *with* Mot. (Ex. 6 [hereinafter Admin.R.] (administrative rule for assigning inmates to two-person cells)). Under this procedure, the Unit Classification Committee (UCC)[14] initially assigns a custody status to an incoming inmate (i.e., minimum-in, medium or close). *See* Mot. (Ex. 4 (Aff. of Salvador Buentello at 1, 2, 3 [hereinafter Buentello Aff.] )); Jefferson Aff. at 1; *see also* Price Aff. I ¶ 11. At least on some occasions, it also decides

whether to place him in 7 or 8 Building. *Compare* Price Aff. I ¶ 10 *with* Jefferson Aff. at 1. When the UCC classifies a new prisoner as close custody, the Unit's Count Room[15] must ascertain whether or not the proportion of prisoners in the racial or ethnic group (African–American, Caucasian or Hispanic) of which he is a member in any of the Pods in the Building to which he has been assigned fails to mirror the proportion of the Terrell Unit's total close custody inmate population that the racial or ethnic group of which he is a member comprises. *See* Jefferson Aff. at 1–2; *cf.* Price Aff. I ¶ 10. If the new inmate's racial or ethnic group is underrepresented in one of the Pods, then Count Room places him in it; otherwise, it puts him in Pod A. *See* Jefferson Aff. at 2; *see also* Admin.R. The Count Room repeats this process to determine in which the Section of the Pod to house him. *See* Jefferson Aff. at 2; *see also* Admin.R. If the new prisoner neither suffers from a physical infirmity nor has been restricted to sharing a cell only with a person of his race or ethnicity, then the Count Room puts him in the first available cell in the Section to which it assigns him.[16] *See* Jefferson Aff. at 2; *see also* Price Aff. I ¶¶ 10–12; Admin.R.; Price Dep. at 38.

19. During the time relevant to this case (i.e., the date on which the Terrell Unit opened through August 5, 1994), two geographic concerns affected cell assignment decisions at the Terrell Unit. First, all close custody prisoners from the same town or neighborhood, regardless of race, were housed together. *See* Resp. (Pl.'s Ex. C (Operational Review Report at 5 [hereinafter Op.Rev.Rep.] )). This geographic housing policy reflected a belief by Terrell Unit officials "that inmates from the same areas would get along well together and [would] create fewer problems for the [prison] staff."

---

face consequences much worse than an undesirable cellmate.
*Id.* at 631.

**14.** The UCC "is usually composed of an assistant warden, a security lieutenant or above and someone from treatment, such as medical classification and education." Jefferson Aff. at 1. The Terrell Unit's Senior Warden sometimes sits on it. *See* Price Aff. I ¶ 11.

**15.** The Count Room determines the particular cell in which to place a new inmate. *See* Jefferson Aff. at 1.

**16.** The record suggests that someone outside of the Terrell Unit determines whether or not a physical infirmity or a problem with persons of a different race or ethnicity limits where a new prisoner can be placed. *See* Price Aff. I ¶ 11; Jefferson Aff. at 1–2; Admin.R.

Op.Rev.Rep. at 5. Second, close custody Hispanic inmates from South Texas and close custody Hispanic inmates from West Texas were placed in separate buildings. *See* Price Aff. I ¶¶ 8–10. Terrell Unit's Senior Warden at the time, Keith Price, ordered implementation of this latter policy to reduce the risk of violence between these two groups, which are historic enemies. *See* Price Aff. I ¶¶ 8–9; *see also* Price Dep. at 100–01. According to him, "[e]ven if there had been no separation of west and south Texas Hispanic close custody inmates, both 7 and 8 buildings would have still housed essentially the same percentage of Hispanic inmates (approximately 50%) compared to the remainder of close custody inmates (Caucasians and African–Americans totaled approximately 50%)." [17] Price Aff. I ¶ 10.

### Events Prior to August 5, 1994

#### Security Measures

20. The risk of inmate-on-inmate violence exists in prison. *See* Price Aff. II ¶ 13; *supra* ¶ 13; *see also* Price Aff. II ¶ 11 (recognizing that prisoners sometimes fight with each other). This threat sometimes manifests itself in a demand by some prisoners that another of their fellows pay them "protection money" [18] or fight them for the privilege of not having to do so. *See* Torres Aff. at 1.

21. A number of measures were instituted at the Terrell Unit to reduce the risk of disorder among close custody inmates. First, an intercom system was installed in all Pods in 7 and 8 Buildings so that prisoners could communicate safety concerns to prison officials. *See* Johnson Aff. ¶¶ 3, 14; Price Aff. I ¶¶ 20–21; *see also supra* ¶ 15. Second,

to facilitate the preemption of situations heightening the possibility of inmate-on-inmate violence, a Gang Intelligence Unit (GIU), comprised of four full-time COs, gathered information from anonymous sources about inmate gang or group activities and reported their findings to the Senior Warden almost every day.[19] Price Aff. I ¶ 19; Price Dep. at 130. Third, close custody inmates subject to legitimate threats from fellow prisoners were entitled to placement in protective custody. Price Aff. I ¶ 20. Fourth, close custody inmates from South Texas and close custody inmates from West Texas were housed in different Buildings. *See* Price Aff. I ¶¶ 8–9; *see also supra* ¶ 20. Fifth, COs were told that young Caucasians in close custody cellblocks faced a higher risk of harm than other prisoners and were reminded daily to remain alert for activity indicating that close custody inmates, especially Caucasians in 7 Building, were facing demands for payment of "protection money." Torres Aff. at 1, 2. Sixth, the design of the guard tower for each Pod enabled the direct monitoring of most prisoner activity. *See* Torres Aff. 1–2; Katsaris Aff. ¶ 2; *see also supra* ¶ 15. Finally, two COs, known as rovers, were assigned to work among the close custody inmate population in each Pod.[20] *See* Price Aff. I ¶ 25; Johnson Aff. ¶ 4; Price Aff. II ¶ 11.

#### CO Training

22. COs at the Terrell Unit began to work without supervision after they had received certification and training. Certification signified that a person had completed his or her CO training and was capable of performing any function of a CO at any TDCJ–ID facility. Price Aff. II ¶ 9; *see* Price Aff. I ¶ 23; Johnson Aff. ¶ 10. CO training occurred in two stages. First, a CO completed

---

17. The record fails to establish conclusively whether or not the two geographic concerns bore any relationship to each other. *See, e.g.,* Price Aff. I ¶¶ 7–8; Price Dep. at 100–01. For example, it affords little, if any, insight about the obvious question raised by their co-existence: did the first one derive from the second?

18. "Protection money" usually assumes the form of either goods from the prison commissary or participation in homosexual acts. *See* Torres Aff. at 1; Price Dep. at 119; Resp. (Pl.'s Ex. F (Videotaped Dep. of Essie Johnson at 87 [hereinafter Johnson Dep.])); Price Aff. II ¶ 10.

19. In particular, a GIU assists efforts to learn whether or not demands for "protection money" are being made. *See* Resp. (Pl.'s Ex. H (Dep. of John McAuliffe at 80–81 [hereinafter McAuliffe Dep.])).

20. The record fails to disclose unequivocally whether the geographic segregation policy represented a security measure. *See* Op.Rev. at 5; *see also supra* ¶ 19.

the TDCJ's two-week training academy, Price Aff. I ¶ 22; see Price Aff. II ¶ 9, where he or she learned about aspects of prison life, including the nature of close custody inmates, the risk of prisoners using steel-toed workboots as weapons,[21] the existence of prisoner gangs based on race and the possibility of those gangs seeking "protection money" from other inmates, Johnson Dep. at 49, 87–91. Second, he or she went through two weeks of on-the-job training at the Terrell Unit, Price Aff. I ¶ 22; Johnson Aff. ¶ 10, during which he or she was instructed to report suspicious inmate activity, see Torres Aff. at 1–2; Johnson Dep. at 132; cf. Johnson Dep. at 197 (reporting that COs attending the TDCJ's training academy were taught to be alert for suspicious prisoner activity). He or she also was told to take the following, progressive measures if he or she saw inmates congregating in an inappropriate manner while working in a guard tower control room: order the prisoners to disperse, direct a rover to the area if the prisoners refuse to move and seek help from the CO manning the Building's front desk if the rover is unable to assist.[22] Johnson Dep. at 149–50; see Johnson Aff. ¶ 9; Torres Aff. at 1–2.

### First Inmate Death

23. The Terrell Unit experienced its first inmate death for non-medical reasons in mid-July, 1994, when Paul Hernandez was discovered dead in Section A of 7 Building's B Pod. Price Aff. I ¶¶ 15, 17. Although the jail physician ruled at the time that Hernandez had choked to death on regurgitation, Price Aff. I ¶¶ 14, 16, a TDCJ Internal Affairs Division (TDCJ–IAD) report released several months later concluded that he was killed during a lovers' quarrel, Price Aff. I ¶¶ 14, 16.

### August 5, 1994

24. On August 5, 1994, Randy Payne, a twenty-three year old Caucasian, arrived at the Terrell Unit.[23] The UCC chose to preserve his close custody status,[24] Buentello Aff. at 1, 3; Price Aff. I ¶ 11; see Jefferson Aff. at 2, and assigned him to 7 Building, Jefferson Aff. at 1–2. The Count Room then identified Section B of Pod C as the area in 7 Building (Section B) in which to house him.[25] See Jefferson Aff. at 2.

25. Shortly after his arrival in Section B later in the day, Randy Payne was confronted with a demand to pay "protection money" or to fight for the privilege of having not to do so. He chose to fight. The ensuing altercations occurred in various locations throughout Section B, including the third level shower area.[26] Katsaris Aff. at 3; McAuliffe Dep. at 37–38. All of the prisoners whom Randy Payne fought were either African–American or Hispanic. Torres Aff. at 2. Some of them used steel-toed boots as weapons. See Price Aff. II ¶ 7 ("I am unaware of a single incident involving serious injury at the Terrell Unit, prior to August 5, 1994, involving close custody black or Hispanic inmates using steel-toed boots to assault a Caucasian or other inmates.").

26. On August 5, 1994, Essie Johnson, a CO who had worked at the Terrell Unit for only a brief time, see Johnson Aff. ¶ 10 (two-and-a-half months); Katsaris Aff. at 5 (one month); Torres Aff. at 2 ("new hire"), was

---

21. The TDCJ–ID required issuance of steel-toed workboots to all prisoners. Price Aff. II ¶ 7; see Price Dep. at 152.

22. Price played no role in establishing CO certification and training standards. See Price Aff. I ¶ 24; Price Aff. II ¶ 9.

23. On August 5, 1994, James A. Collins was the TDCJ's Executive Director and Wayne Scott was the TDCJ–ID's Director. Cf. Joint Final Pretrial Order at 3 [hereinafter Pretrial Order] (Stipulation and Uncontested Issue of Fact 2). Compare Pls.' Second Am.Compl. and Req. for Jury at 1, 3 with Defs' First Am.Ans.; Req. for Ct. to Order Rule 7(a) Reply Under Schultea at 1–2.

24. Randy Payne had been transferred from the Smith Unit, which houses minimum-in and medium custody inmates, Buentello Aff. at 1, 2–3, to the Terrell Unit after the Smith Unit's UCC had upgraded his status to close custody, Buentella Aff. at 3.

25. Price took no part in deciding either Randy Payne's custody status or his specific cell assignment. Price Aff. I ¶ 11. The record fails to disclose whether he played any role in choosing whether to put Randy Payne in 7 or 8 Building. See Price Aff. I ¶ 11.

26. The fights apparently occurred between 7:00 p.m. and 8:30 p.m. See Johnson Aff. ¶ 6.

assigned to man the guard tower control room for 7 Building's C Pod (Pod C) during the prison's second shift, which ran from 2:00 p.m. to 10:00 p.m., Johnson Aff. ¶ 3.[27] She was fully trained and certified to work as a CO.[28] *Compare* Price Aff. I ¶ 22 *with* Johnson Aff. ¶ 10 *and* Price Aff. II ¶ 9.

27. At approximately 8:30 p.m., Johnson saw an injured inmate, later identified as Randy Payne, on the stairs in Section B. She telephoned Alex Torres, the CO who was then working at 7 Building's front desk, for assistance.[29] Johnson Aff. ¶ 9; *see* Torres Aff. at 1. Torres entered Pod C. He determined that Randy Payne required immediate medical attention. Randy Payne, subsequently, was removed to the Terrell Unit's infirmary. Johnson Aff. ¶ 10; *see also* Torres Aff. at 1.

28. Prior to 8:30 p.m., Johnson had noticed some inmates congregating around the third level showers in Section B,[30] Johnson Dep. at 133, 143–47, and had seen two prisoners looking into an area of the third level showers in Section B, Johnson Dep. at 168; *see* Resp. (Pl.'s Ex. D (Supplemental Offense Report at 2 [hereinafter Supp.Off.Rep.] )). Johnson also had permitted inmates to move between Sections freely.[31] Supp.Off.Rep. at 2–3.

29. On August 12, 1994, Randy Payne died because of injuries sustained in the fights at the Terrell Unit a week earlier. *See*

### Operational Review Report

30. In October 1994, the TDCJ–ID assessed all aspects of the Terrell Unit after a number of inmates attacked some COs and a prisoner was found dead.[32] Op.Rev.Rep. at 1. The resulting Operational Review Report cited the geographic housing policy and the high concentration of relatively inexperienced COs working on the second shift, the peak period for activity in close custody cellblocks, as conditions weakening prison security.[33] Op.Rev.Rep. at 5, 9–10, 12–13.

### Litigation

31. On November 17, 1994, the Paynes filed this Section 1983 action against Collins, Scott, Price and Johnson, in which they alleged that these four TDCJ officials had failed to protect Randy Payne from being assaulted by his fellow inmates in violation of the Eighth Amendment. Pls.' Original Compl. at 1–2.

32. In a deposition taken as part of the discovery in this case, Price indicated that he generally knew about "protection money," *see* Price Dep. at 118–19, disclosed that, as the Terrell Unit's "chief administrative officer," he was "ultimately in charge of the [prison] security program," Price Dep. at 19–20, and possessed the authority to impose experience and competence standards for

---

27. Johnson had received her assignment to man Pod C's guard tower, from a shift lieutenant or a shift captain. *See* Price Aff. I ¶ 22.

28. When she had applied for a position with the TDCJ–ID in 1993, Johnson had received a "[l]ow" score for "[r]esponsibility." Resp. (Pl.'s Ex. M (Johnson's Applicant Evaluation of 3/22/93)).

29. Johnson called Torres after concluding that the sole rover in Pod C at the time, Thomas Mangrum, was unable to reach the injured inmate without jeopardizing his own security. Johnson Aff. ¶¶ 4, 9.

30. Although the Paynes assert that Johnson saw the prisoners by Section B's showers during the period when Randy Payne was fighting, *see* Resp. at 6, the record fails to disclose exactly when she observed them, *see* Johnson Dep. at 132, 142–44.

31. The record offers no indication as to whether Price knew about Johnson's practice of permit-

ting inmates to move between Sections freely. *See, e.g.,* Price Aff. I; Price Aff. II.

32. Both the attack and the discovery of the dead inmate occurred on October 7, 1994. Op.Rev. Rep. at 1.

33. Price disagreed with the Operational Review's criticism of the geographic housing policy. Price Dep. at 140; *cf.* Op.Rev.Rep. at 5 (geographic housing policy "probably works well when the inmates are content, [but] ... backfires when they are not happy"). He also apparently disputed the Operational Review's disapproval of the geographic housing policy to the extent that it assailed the practice of placing close custody Hispanic inmates from South Texas and close custody Hispanic inmates from West Texas in different Buildings. *See* Price Aff. I ¶¶ 8–10. *See generally supra* note 17.

COs working in close custody areas higher than those established by the TDCJ–ID, Price Dep. at 53–54, 82, 130.[34] He also conceded that he was ultimately responsible for decisions on where to house individual prisoners.[35] Price Dep. at 41–42. Finally, he reported that the "free and frequent access" policy increased the risk of inmate-on-inmate violence, Price Dep. at 96; *see also* Resp. (Pl.'s Ex. G (Dep. of Arthur Pina at 121–22 [hereinafter Pina Dep.] )), and that he had approved its discontinuance in 7 and 8 Buildings, *see* Price Dep. at 93–94; *see also* Pina Dep. at 121–22.[36]

## *EIGHTH AMENDMENT: FAILURE-TO-PROTECT*

33. "Prison officials have a [constitutional] duty. . . . to protect inmates from violence at the hands of other prisoners." *Horton v. Cockrell,* 70 F.3d 397, 400 (5th Cir.1995); *accord Johnston v. Lucas,* 786

34. Price gave the following testimony regarding COs:

A: We assign officers in to [the guard tower's control room], regardless of what their past record was, as we fill duty posts, and that's only one of many. Most of the duty posts inside a prison require a lot of responsibility, so whether an employee's been responsible or not so responsible in the past, we're still going to put them in one of those key posts.

. . .

Q: And whoever assigned the guards to transport that person [with close custody status] put a guard with one day experience, or two guard—both guards to transport him had one day of experience, you, as warden of the prison, couldn't have stepped in and said, "No, I want these guys with five years of experience who have seen this before, I want them to do transportation."?

A: I disagree with the theory of what you said, now—

Q: —I'm just asking whether you as warden—

A: —I could have done that, yes.

Q: You, as warden, could have done that?

A: Yes.

. . .

Q: You didn't take any active steps to eliminate [demands for "protection money"] . . . , for example, you didn't assign more experienced guards to close custody areas, correct?

A: I didn't change the procedures that were— that were in place, no.

Price Dep. at 53–54, 82, 130.

35. In the following exchange, Price explained his responsibility as to cell assignment decisions:

Q: So you're saying, as warden, you could go for three hundred and sixty-five days in a row and not make a single autonomous decision and your prison run like a top?

A: Well, I don't know if it'd run like a top or not, but there's—there's not a lot of particularly large areas that—that you have the autonomy to make decisions in, no, I mean—

Q: —you're saying virtually every single decision is made for you?

A: As far as major program impact, most of those are done. How many correctional officers you have, what your budget looks like, how many school teachers you're going to have, what the classification make-up of your unit's going to be; you know, all the critical things that make prison a prison, all of those are done outside of the unit itself.

Q: What about where to put an inmate within your prison?

A: That one is done internally at the unit?

Q: Okay. And you are the head man at the unit, right?

A: Yes.

Q: I mean, the final buck stops with you?

A: Yes.

Q: And the people, whether you make the decision on where to put someone in a particular—in your particular prison or its made by someone else, you're the one who's ultimately responsible for that decision, correct?

A: I don't know if I'd agree with that or not.

Q: Well, would you agree that if Wayne Scott or . . . [James A.] Collins . . . if those two guys are upset about the placement of an inmate within a particular unit, they're going to come to you first, right?

A: Yes.

Q: And they're going to want to know why you—they want to hear—they're—they are going to want to hear your explanation as to how something might have occurred, correct?

A: Yes.

Price Dep. at 41–42.

36. The record provides no insight on two issues related to Price's decision to end the "free and frequent access" policy. First, it gives no indication of exactly when Price authorized the modification of the "free and frequent access" policy. *See* Price Dep. at 93–94; Pina Dep. at 121–22. Second, it fails to explain how Price's termination of the "free and frequent access" policy squared with the need for a party to secure judicial approval before departing from the terms of the *Ruiz* Stipulation relevant to this case, *see supra* note 12.

F.2d 1254, 1259 (5th Cir.1986). To prove a violation of this obligation, the plaintiff must establish the following: "he [or she] is incarcerated under conditions posing a substantial risk of serious harm," *Neals v. Norwood,* 59 F.3d 530, 533 (5th Cir.1995), "[the defendant] prison official[ ] [was] . . . deliberately indifferent to his [or her] need for protection," *id.,* and causation, *LaMarca v. Turner,* 995 F.2d 1526, 1535 (11th Cir.1993), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). "[T]he Eighth Amendment defines the contours of the first two elements and section 1983 delimits the third." *Id.*

34. The first element of a claim alleging that a defendant prison official violated his or her duty to protect an inmate from violence at the hands of other inmates (failure-to-protect claim)—the presence of conditions creating a substantial risk of serious harm—is an objective standard. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811, 822–23 (1994); *see Hudson v. McMillian,* 503 U.S. 1, 8–10, 112 S.Ct. 995, 999–1000, 117 L.Ed.2d 156, 166–68 (1992). "There is no concise definition of what types of prison conditions pose a 'substantial risk of serious harm.'" *Horton,* 70 F.3d at 401. *But cf. Jensen v. Clarke,* 94 F.3d 1191, 1198 (8th Cir.1996) ("Assault at the hands of fellow inmates . . . is a 'serious harm.'"); *State Bank of St. Charles v. Camic,* 712 F.2d 1140, 1146 (7th Cir.) (deliberate indifference only arises where "a strong likelihood, rather than a mere possibility," of serious harm exists), *cert. denied,* 464 U.S. 995, 104 S.Ct. 491, 78 L.Ed.2d 686 (1983); *El Tabech v. Gunter,* 922 F.Supp. 244, 257 (D.Neb.) ("a 'prison official's duty under the Eighth Amendment is to ensure "reasonable safety," ' not guarantee absolute safety"), *aff'd sub nom. Jensen v. Clarke,* 94 F.3d 1191 (8th Cir.1996).

Instead, [a court must] . . . examine this component . . . "contextually," making sure to be responsive to "contemporary standards of decency." [It, specifically,] . . . must consider "whether society considers the risk to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." [It] . . . also must consider that the Eighth Amendment is intended to protect against both present and future dangers to inmates. Prison authorities must protect not only against current threats, but also against "sufficiently imminent dangers" that are likely to cause harm in the "next week or month or year."

*Horton,* 70 F.3d at 401. This approach contemplates not only reviewing the conditions creating a substantial danger to prisoners but also scrutinizing the actions taken by the defendant prison official to alleviate that threat. *See id. Compare Farmer* at 842–43, 114 S.Ct. at 1982–83, 128 L.Ed.2d at 829 ("In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.") *with Hare v. City of Corinth,* 74 F.3d 633, 649 n. 5 (5th Cir.1996) (en banc) (whether or not prison officials have responded reasonably to a substantial danger "relate[s] necessarily to whether the first, or objective, component of an Eighth Amendment violation has been made out").

35. A failure-to-protect claim's second element—that the defendant prison official exhibited deliberate indifference to the substantial risk of serious harm—is a subjective standard. *Farmer,* 511 U.S. at 838, 114 S.Ct. at 1980, 128 L.Ed.2d at 826; *Eason v. Thaler,* 73 F.3d 1322, 1329 (5th Cir.1996); *Harris v. Angelina County, Tex.,* 31 F.3d 331, 334 (5th Cir.1994); *see Farmer,* 511 U.S. at 836, 114 S.Ct. at 1979, 128 L.Ed.2d at 825 ("an official's failure to alleviate a significant risk he [or she] should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment"); *id.* at 835, 114 S.Ct. at 1978, 128 L.Ed.2d at 824 ("deliberate indifference entails something more than mere negligence"). To prove this element, the plaintiff must demonstrate that the defendant prison official knew of and disregarded the substantial risk of serious harm. *Farmer,* 511 U.S. at 836, 114 S.Ct. at 1979, 128 L.Ed.2d at 825. *See generally Hare,* 74 F.3d at 650 (deliberate indifference "is a marriage of elements, not a listing of two elements independent of each other in application"). He or she establishes the de-

fendant prison official's knowledge of the danger to inmate safety by showing that the defendant prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [drew] the inference." *Farmer*, 511 U.S. at 836, 114 S.Ct. at 1979, 128 L.Ed.2d at 825. He or she may prove this condition in "many ways, including from circumstantial evidence. Indeed, the '[f]actfinder may conclude that a prison official knew of a substantial risk form [sic] the very fact that the risk was obvious.'"[37] *Horton*, 70 F.3d at 401; *see also Pavlick v. Mifflin*, 90 F.3d 205, 209 (7th Cir.1996); *El Tabech*, 922 F.Supp. at 257 (plaintiffs are not required "to produce a 'smoking gun' in order to prevail").

> For example, if [the] ... plaintiff presents evidence showing a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-[prison] official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-[prison] official had actual knowledge of the risk.'"[38]

*Farmer*, 511 U.S. at 840, 114 S.Ct. at 1981, 128 L.Ed.2d at 827.

> [However, just because] a trier of fact many infer knowledge from the obvious ... does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts

indicating a sufficiently substantial danger and that they were therefore unaware of the danger, or that they knew of the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

*Id.* at 842, 114 S.Ct. at 1982, 128 L.Ed.2d at 828; *see id.* at 836, 114 S.Ct. at 1979, 128 L.Ed.2d at 825 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he [or she] must also draw the inference"). As to the other part of the deliberate indifference standard—the disregarding by the defendant prison official of the substantial risk of serious harm about which he or she knows—the plaintiff must establish that the defendant prison official "knew of ways to reduce the harm but knowingly declined to act, or.... knew of ways to reduce the harm but recklessly declined to act." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1583 (11th Cir.1995); *see Woods v. Lecureux*, 110 F.3d 1215, 1224–26 (6th Cir. 1997) (indicating that a defendant prison official exhibits deliberate indifference only when he or she deliberately disregards a substantial risk of serious harm); *Hare*, 74 F.3d at 649 n. 5 ("where there is a recognition of a substantial danger and a response thereto, this second prong can be satisfied only in respect to the response itself"); *LaMarca*, 995 F.2d at 1536 ("if an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he [or she] cannot be deliberately indifferent unless he [or she] knows of, but disregards, an appropriate and sufficient alternative").

---

**37.** This situation arises only "[u]nder exceptional circumstances." *Reeves v. Collins*, 27 F.3d 174, 176 (5th Cir.1994).

**38.** Although the factfinder may infer the defendant prison official's knowledge of the substantial risk of serious harm from the risk's obviousness, whether or not it can infer that the risk was objectively obvious represents a distinguishable issue. *See Coppage v. Mann*, 906 F.Supp. 1025, 1039 (E.D.Va.1995); *cf. Farmer*, 511 U.S. at 835 n. 3, 114 S.Ct. at 1977 n. 3, 128 L.Ed.2d at 823 n. 3 ("At what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes is a question this case does not present, and we do not address it.").

The two inferences are quite different. [The factfinder may make an] inference of actual knowledge because it is usually impossible to prove directly a defendant's state of mind. But it is possible to prove that a particular risk was objectively obvious and there is therefore less need to permit inferences as to obviousness.

*Coppage*, 906 F.Supp. at 1039; *cf. Falls v. Nesbitt*, 966 F.2d 375, 378 (8th Cir.1992) ("In every case, a 'pervasive risk' is something more than a single incident and something less than a riot."); *Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.) ("[a] pervasive risk of harm may not ordinarily be shown by pointing to a single or isolated incidents"), *cert. denied*, 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980).

■ 36. Causation is the final element of a failure-to-protect claim. *LaMarca,* 995 F.2d at 1535, 1539. To prove it, the plaintiff must show the "defendant [prison official's] participation in the alleged wrong." *Jacquez v. Procunier,* 801 F.2d 789, 793 (5th Cir. 1986); *see Williams,* 671 F.2d at 900 n. 15 ("In order to establish the personal liability of a given defendant, the plaintiffs must show that a particular official's actions (or inaction) caused a violation of the plaintiff's rights."). The need to show personal participation forecloses the plaintiff from prevailing based on a theory of respondeat superior or respondeat inferior.[39] *Coleman v. Houston Indep. Sch. Dist.,* 113 F.3d 528, 534 (5th Cir.1997); *accord Thompkins v. Belt,* 828 F.2d 298, 303 (5th Cir.1987); *Reimer v. Smith,* 663 F.2d 1316, 1323 (5th Cir.1981); *see Douthit v. Jones,* 641 F.2d 345, 346 (5th Cir.1981) (to prove a supervisory official liable for a constitutional breach, the plaintiff "must establish that the ... supervisory official was personally involved in the acts causing the deprivation of ... constitutional rights or that a causal connection exists between an act of the official and the alleged constitutional violation"); *see also Woods v. Edwards,* 51 F.3d 577, 583 (5th Cir.1995) (affirming dismissal of claims against officials of the Louisiana state government and the Louisiana Department of Corrections alleging liability based on respondeat superior).

■ 37. The causation element manifests itself in two links. *Hale,* 50 F.3d at 1584; *see LaMarca,* 995 F.2d at 1538–39. First, the plaintiff must demonstrate a connection "between [the defendant prison official's] ... deliberately indifferent acts and

omissions and the [substantial risk of serious harm]." *Hale,* 50 F.3d at 1584. Second, he or she must show that the substantial risk of serious harm "to which the [defendant prison official was] ... deliberately indifferent [was] ... a risk that caused [the plaintiff's] ... injury."[40] *Langston,* 1995 WL 461912, at *3 (citing *Hale*). To prove these two connections, the plaintiff must do more than "merely show[ ] ... [that the defendant prison] official had the means to correct a constitutional infirmity." *Hale,* 50 F.3d at 1581; *see Doe v. Sullivan County,* 956 F.2d 545, 550 (6th Cir.) ("[M]ore is required than [a] naked assertion that the assault would not have occurred but for the offensive [prison] conditions. To hold otherwise would effectively transform the causality requirement from a substantive element of proof into one of pleading."), *cert. denied,* 506 U.S. 864, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992); *cf. Trotter v. Peters, III,* No. 94 C 791, 1995 WL 117906, at *5 (N.D.Ill. Mar.15, 1995) (" '[p]risons are dangerous places' and a certain degree of violent behavior is unavoidable"), *aff'd,* 106 F.3d 403 (7th Cir.1997).

### EVIDENTIARY RULINGS

■ 38. The court makes several evidentiary rulings sua sponte [41] and rules on objections to the Paynes' evidence before reaching the merits of the summary judgment motion. *See Christophersen v. Allied–Signal Corp.,* 939 F.2d 1106, 1109–10 (5th Cir.1991) (en banc).

#### Sua Sponte Rulings

■ 39. The court finds inadmissible Johnson's unsigned, unsworn affidavit, which

39. The plaintiff's inability to prevail based on a theory of respondeat inferior means that he or she can succeed only by showing that the defendant prison official knew about measures to lessen the substantial risk of serious harm *and* possessed the authority to implement them. *See Hale,* 50 F.3d at 1583–84; *LaMarca,* 995 F.2d at 1539.

40. The following example illuminates the second link:
> Consider ... a prisoner in protective custody who is intentionally and wrongfully moved to the general population. That prisoner could, nonetheless, hardly complain if he [or she] was injured in a fire that swept through the general population area. Although the prison official's

> conduct in moving him [or her] into the general population was a cause in the "but for" sense of the prisoner's injury, the fire was completely independent of the risk that the prison officials disregarded by moving him [or her] into the general population.

*Langston v. Peters,* No. 93 C 2607, 1995 WL 461912, at *3 (N.D.Ill. Aug.2, 1995), *aff'd,* 100 F.3d 1235 (7th Cir.1996).

41. The sua sponte evidentiary rulings fulfill the court's duty to "assess the evidence presented upon the motion for summary judgment to determine its admissibility." *Gauck v. Meleski,* 346 F.2d 433, 436 (5th Cir.1965).

appears as Exhibit 2 to Defendants' Reply to Plaintiffs' Response to Motion for Summary Judgment (Reply). *See Martin v. John W. Stone Oil Distrib., Inc.,* 819 F.2d 547, 549 (5th Cir.1987) ("Unsworn documents are ... not appropriate for consideration [in the summary judgment context]."); *Redd v. Fisher Controls,* 814 F.Supp. 547, 552 (W.D.Tex.1992) (affidavit deficient, in part, because of absence of notarization), *aff'd,* 35 F.3d 561 (5th Cir.1994); *Iowa Fleeting Serv., Inc. v. Watson Marine Servs., Inc.,* CIV. A. No. 87–0655, 1988 WL 92020, at *1 (E.D.La. Aug.24, 1988) (refusing to consider an unsigned affidavit).

■ 40. The court finds inadmissible excerpts from uncertified state criminal trial transcripts, which appear as Plaintiff's Exhibits I, J, K and L to Plaintiffs' Response to Defendants' Motion for Summary Judgment (Response), because the assertion of authenticity made in the affidavit of Darrin Walker, one of the Paynes' attorneys, which appears as Plaintiff's Exhibit N to the Response, fails to lay an adequate foundation for those documents. *Compare* Resp. (Pl.'s Ex. N (Aff. of Darrin Walker at 2 [hereinafter Walker Aff. ])) *with Beyene,* 854 F.2d at 1182. *See generally Hal Roach Studios v. Richard Feiner and Co.,* 896 F.2d 1542, 1550–51 (9th Cir.1989).

■ 41. The court finds a statement in the Operational Review Report, which appears as Plaintiff's Exhibit C to the Response, conveying prisoner comments on the Terrell Unit's geographic housing policy to constitute inadmissible hearsay. *See* Fed. R.Evid. 803(6) advisory committee note; *Miller v. Field,* 35 F.3d 1088 (6th Cir.1994); *United States v. Tajeddini,* 945 F.2d 458, 463–65 (1st Cir.1991), *cert. denied,* 505 U.S. 1211, 112 S.Ct. 3009, 120 L.Ed.2d 883 (1992); *United States v. Snyder,* 787 F.2d 1429,

1433–34 (10th Cir.), *cert. denied,* 479 U.S. 836, 107 S.Ct. 134, 93 L.Ed.2d 78 (1986).

42. The court considers Stipulations and Uncontested Issues of Fact recited in this case's Joint Final Pretrial Order, which it has entered. *See Munoz,* 563 F.2d at 207; *Swallow,* 831 F.Supp. at 577–78.

■ 43. The court takes judicial notice of its file for this case, *see Aloe Creme,* 425 F.2d at 1296, and the portions of the Stipulation entered in *Ruiz*[42] relevant to this case, *see Colonial,* 762 F.2d at 459; *see also Opoka,* 94 F.3d at 394.

### Rulings on Objections to the Paynes' Evidence

■ 44. The court overrules the objection to W. Ken Katsaris, whose affidavit appears as Plaintiff's Exhibit A to the Response, as unqualified to testify as an expert on maximum security prison facilities, especially those in Texas, because of a lack of personal familiarity with such matters, Reply at 3–4. Katsaris, who has acquired extensive training and education in prison operations, possesses sufficient expertise to testify about maximum security jails, including those in Texas; the objection relates to how much weight to give his expert testimony.[43] *See Compton v. Subaru of Am., Inc.,* 82 F.3d 1513, 1520 (10th Cir.1996) ("As long as an expert stays 'within the reasonable confines of his [or her] subject area,' our case law establishes 'a lack of specialization does not affect the admissibility of [the expert] opinion but only its weight.'"); *Martin v. Fleissner GmbH,* 741 F.2d 61, 64 (4th Cir.1984) (finding witness' "lack of direct experience is not a sufficient basis to reject their testimony, but may affect the weight that testimony is given, a decision properly made by the jury"); *see also McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2d Cir. 1995) (rejecting the argument that a certi-

**42.** The court has directed the Clerk of Court to put a copy of the *Ruiz* Stipulation in this case's file.

**43.** Katsaris has provided instruction to law enforcement officials throughout the United States on correctional issues, including inmate deaths, served on the Florida Correctional Standards Council, received certification in jail and prison management from the National Institute of Cor-

rections, taken numerous courses on prison operations and presently holds memberships in the American Correctional Association, the North American Association of Wardens and Superintendents, the International Association of Correctional Officers and the American Jail Association. Pl.'s Disclosure of Expert Testimony (Curriculum Vitae of W. Ken Katsaris).

fied ears, nose and throat doctor who had practiced for over twenty years "had to be a specialist in environmental medicine to provide expert testimony" on the issue of whether or not glue fumes cause throat polyps); *Lavespere,* 910 F.2d at 175–77 (rejecting the argument that a mechanical engineer lacking "practical experience designing a particular product cannot be qualified to testify as an expert concerning the design of that product in a product liability action").

■ 45. The court overrules the objection to Katsaris' conclusion that Johnson "had to have known of the substantial risk of serious injury faced by inmate[s] in" Pod C as lacking an evidentiary basis, *see* Reply at 4. Katsaris' expert opinion derives from a review of transcripts of state prosecutions of two of the inmates who fought Randy Payne, documents that the defendants have disclosed, the Operational Review Report, the TDCJ–IAD reports regarding Randy Payne's death, Johnson's personnel file, the American Correctional Association Manual of Standards for the Operation of Adult Correctional Institutions, a personal inspection of Pod C and knowledge of generally accepted standards for prison administration, Katsaris Aff. ¶ 1. *See Dixon v. International Harvester Co.,* 754 F.2d 573, 580 (5th Cir.1985) (expert testimony based upon inspection of materials detailing product's design and photographs of product at the time of accident admissible); *see also McCullock,* 61 F.3d at 1043–44. *See generally Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469, 482 (1993) ("Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." (citation omitted)).

46. The court overrules the objection to Katsaris' conclusion that Johnson "had a 'clear view' of the locations of the purported assaults" on Randy Payne as failing to appreciate the setting in which Johnson was working, Reply at 5. This challenge goes to the weight of his expert opinion. *See Dixon,* 754 F.2d at 580; *see also McCullock,* 61 F.3d at 1043–44.

■ 47. The court overrules the objection to the Supplemental Offense Report prepared by the TDCJ–IAD following the fights involving Randy Payne, which appears as Plaintiff's Exhibit D to the Response, as unauthenticated, Reply at 5–6. The Supplemental Offense Report was part of defendants' initial disclosure and was an exhibit to Johnson's deposition. *Compare* Supp.Off. Rep. at 1 (label reading "Johnson Exhibit 4" affixed) *and* Walker Aff. at 1 (reporting, based on personal knowledge, that the Supplemental Offense Report "was produced by the Defendants in their Notice of Initial Disclosure in this lawsuit") *with Anderson v. Cramlet,* 789 F.2d 840, 845 (10th Cir.1986) ("Defendants obtained [plaintiff's] ... letter ... in a request for production of documents. It is therefore admissible under Rule 56(c).") *and In re Greenwood Air Crash,* 924 F.Supp. 1511, 1512 (N.D.Ind.1995) ("Production of a document by a party constitutes an implicit authentication of that document."). *Compare* Walker Aff. at 1 (reporting, based on personal knowledge, that the Supplemental Offense Report "was attached as an exhibit to the deposition of Defendant Essie Johnson") *with Colan v. Cutler–Hammer, Inc.,* 812 F.2d 357, 365 n. 14 (7th Cir.) (Appendix) ("A district court, in a federal summary judgment proceeding, may consider materials beyond the pleadings, including ... exhibits made part of a deposition record."), *cert. denied,* 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987) *and Starr v. Katz,* Civ. A. No. 91–3365, 1994 WL 548209, at *6 (D.N.J. Oct.5, 1994) ("Some [documents] have been marked at depositions, and the Court presumes that the transcripts submitted are of the depositions at which they were authenticated.") *and DiCarlo v. Surety Life Ins. Co.,* 715 F.Supp. 974, 976 (D.Or.1989) (four exhibits authenticated in depositions, three of which were originally produced by the objecting party, "have been properly authenticated for consideration in the motion for summary judgment") *and Painters Dist. Council No. 30 Pension Fund v. Reece Servs., Inc.,* No. 87 C 2156, 1988 WL 139224, at *5 n. 1 (N.D.Ill. Dec.19, 1988) ("As an initial matter the court notes that plaintiffs have stated, and [defendant] ... has not refuted, that exhibits A, B, C, and G of

plaintiffs' appendix of exhibits [in support of their summary judgment motion] were attached as exhibits to the deposition ... taken on written questions. As such, the exhibits are properly before the court on this summary judgment motion."), *aff'd*, 932 F.2d 971 (7th Cir.1991).

■ 48. The court overrules the objection to the Supplemental Offense Report as hearsay, Reply at 6. That document constitutes an admission by Johnson, a party to this case. *See* Fed.R.Evid. 801(d)(2); *see also United States v. Copple*, 827 F.2d 1182, 1188–89 (8th Cir.1987) (FBI agent's testimony relating statements made by defendants during his investigation qualify as party admissions), *cert. denied*, 484 U.S. 1073, 108 S.Ct. 1046, 98 L.Ed.2d 1009 (1988); *State Farm Mut. Auto. Ins. Co. v. Lucca*, 838 F.Supp. 670, 671 (D.Maine 1993) (defendant's statements to plaintiff's investigator were party admissions).

49. The court overrules the objection to the Supplemental Offense Report as inaccurate, Reply at 6. This complaint goes to the document's credibility. *See International Shortstop*, 939 F.2d at 1263; *see also Abordo v. State*, 902 F.Supp. 1220, 1224 (D.Hawai'i 1995) (dicta indicating that an objection to admission of prison records with which someone allegedly has tampered relates to credibility).

■ 50. The court overrules the relevancy objection to Supplemental Offense Report's disclosure that Johnson permitted prisoners to move freely between Pod C's Sections, Reply at 6.[44] This evidence pertains to Johnson's level of experience and competence, as well as to her credibility. *See* Fed.R.Evid. 401; *Daubert*, 509 U.S. at 587, 113 S.Ct. at 2794, 125 L.Ed.2d at 479 (Federal Rule of Evidence 401's "basic standard of relevance is a liberal one").

■ 51. The court overrules the objection to Katsaris' conclusion that "it 'is not possible' that Johnson didn't see anything out of the ordinary happening on August 5, 1994," as "unadulterated speculation, conjec-

ture and conclusion," Reply at 6; *see also* Reply at 8. Katsaris' opinion derives from a number of sources, including a personal inspection of Pod C, Katsaris Aff. at 1–2. *See Dixon*, 754 F.2d at 580; *see also McCullock*, 61 F.3d at 1043–44. *See generally Daubert*, 509 U.S. at 591, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.

52. The court overrules the objection to Katsaris' reliance on testimony in other cases from inmates present at the time of the fights involving Randy Payne as a basis for his opinions, Reply at 7. This challenge relates to the weight of Katsaris' views. *See Dixon*, 754 F.2d at 580; *McCullock*, 61 F.3d at 1043–44.

53. The court overrules the attack on Alex Torres, whose affidavit appears as Plaintiff's Exhibit B to the Response, as biased, Reply at 7. This complaint goes to Torres' credibility. *See International Shortstop*, 939 F.2d at 1263; *see also Leonard v. Dixie Well Serv. & Supply Co.*, 828 F.2d 291, 294 (5th Cir.1987) ("The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed; it is for the jury at trial, not the judge on a pretrial motion, to decide whose evidence is more credible.").

54. The court overrules the objection to Katsaris' affidavit for "address[ing] [n]either how [n]or if [certain] ... crucial and critical facts were considered at all in the opinions he [has] proffered," Reply at 7. This challenge never specifies the portions of Katsaris' affidavit to which it refers. *See Casas Office Machs., Inc. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 682 (1st Cir.1994) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738 (2d ed.1983)); *Underwood v. Waddell*, 743 F.Supp. 1291, 1293 n. 1 (S.D.Ind.1990) ("Although plaintiff filed a motion to strike the affidavits, the motion must be denied for failure to specify what specific portions of the affidavits are objectionable.").

*Consolidated Rail Corp.*, 672 F.2d 217, 220 n. 4 (1st Cir.1982) (quoting authority).

---

**44.** As the objection identifies no particular relevancy concern, it presumably is raised under Federal Rule of Evidence 401. *See Bryant v.*

■ 55. The court overrules the objection to Torres' conclusion that "the attacks on Randy Payne could not have occurred without Johnson noticing" as "incompetent speculation, conjecture and a bald, conclusory assertion," Reply at 8. Torres' opinion derives from personal knowledge of Pod C's design and of the instructions received by COs at the Terrell Unit, Torres Aff. at 1–2.[45] *See* Fed.R.Evid. 701; *United States v. Davis*, 792 F.2d 1299, 1304–05 (5th Cir.), *cert. denied*, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986); *see also Booth v. Intertrans Corp.*, Civ.A. No. 94–2359, 1995 WL 324631, at *3 (E.D.La. May 26, 1995).

■ 56. The court sustains the objections to Katsaris' conclusion that Price and Johnson, respectively, exhibited "deliberate indifference," Reply at 8, 12–13, which he defines in legal terms. *See Woods*, 110 F.3d at 1219–21; *see also Salas*, 980 F.2d at 304–05.

■ 57. The court overrules the objection to the Operational Review Report as unauthenticated, Reply at 13. That document was an exhibit to Price's deposition. *Compare* Op.Rev.Rep. at 1 (label identifying Operational Review as "Price Exhibit No. 1") *and* Walker Aff. at 1 (reporting, based on personal knowledge, that the Operational Review Report was attached to Price's deposition as an exhibit) *with Xerox*, 888 F.2d at 357 *and Colan*, 812 F.2d at 365 n. 14 *and Starr*, 1994 WL 548209, at *6 *and DiCarlo*, 715 F.Supp. at 976 *and Painters*, 1988 WL 139224, at *5 n. 1.

■ 58. The court overrules the objection asserting that the Operational Review Report lacks relevance because it was instigated by events subsequent to the attacks on Randy Payne, Reply at 11, 13. This challenge goes to how much weight should be accorded to the Operational Review. *See International Shortstop*, 939 F.2d at 1263.

■ 59. The court overrules the objection to the Operational Review Report as inadmissible hearsay, Reply at 13.[46] That document, as well as the statements by Terrell Unit employees that it records, comes within the business records exception to the hearsay rule.[47] *See* Fed.R.Evid. 803(6); *Wilson v. Zapata Off-Shore Co.*, 939 F.2d 260, 271 (5th Cir.1991) ("Double hearsay in the context of a business record exists when the record is prepared by an employee with information supplied by another person. If both the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business, the multiple hearsay is excused by [Federal] Rule [of Evidence] 803(6)."); *Florida Canal Indus., Inc. v. Rambo*, 537 F.2d 200, 202 n. 5 (5th Cir.1976); *cf.* Fed.R.Evid. 803(8); *Miller*, 35 F.3d at 1091–92; *Tokio Marine Management, Inc. v. M/V Zim Toyko*, No. 91 Civ. 0063 (PKL), 1993 WL 322869, at *9 (S.D.N.Y. Aug.17, 1993).

60. The court overrules the objection to the Operational Review Report as containing "conclusory assertions which [are] ... inadmissible," Reply at 13. This challenge fails to specify sufficiently which particular statements in the Operational Review Report fall within its scope. *See* Fed.R.Evid. 103(a)(1); 21 Charles Alan Wright & Kenneth W. Graham, *Federal Practice and Procedure* § 5036 (1977).

## DISCUSSION

61. Having ruled on the admissibility of the evidence presented in support of and opposition to defendants' summary judgment motion, the court now considers the motion's

---

45. Because the Paynes express uncertainty about whether they intend to seek Torres' qualification as an expert, Pre-Trial Order at 31, 33 (identifying Torres as a "potential" expert witness), the court treats his statement as an opinion by a lay person.

46. This objection only goes to portions of the Operational Review relating statements by Terrell Unit officials. *See* Reply at 13. *But cf. supra* ¶ 41.

47. Prison systems, such as the TDCJ–ID, lie within Federal Rule of Evidence 803(6)'s conception of a business. *See Wheeler v. Sims*, 951 F.2d 796, 802 n. 5 (7th Cir.) ("A prison is clearly a 'business' within the meaning of the term in Rule 803(6)." (internal quotations omitted)), *cert. denied*, 506 U.S. 914, 113 S.Ct. 320, 121 L.Ed.2d 241 (1992); *Snyder*, 787 F.2d at 1430–31, 1433–34 (investigative report of prisoner misconduct regarded as a business record).

merits as to each defendant. *See Christophersen*, 939 F.2d at 1109–1110.

### Collins and Scott

62. Collins and Scott contend that they must receive summary judgment because the Paynes present nothing beyond their second amended complaint to support their Eighth Amendment claims against either of them. *See* Mot. at 5–6.

63. The Paynes offer no evidence to counter the properly supported summary judgment motion of Collins and Scott.[48] *See* Resp. at 1 n. 1. Consequently, their Eight Amendment claims against these two defendants fail. *See International Shortstop*, 939 F.2d at 1264, 1266; *Lavespere*, 910 F.2d at 178.

### Price

64. Price maintains that the uncontroverted facts "demonstrate[ ] that [he was] ... not deliberately indifferent to a substantial risk of serious harm to [Randy] Payne," Mot. at 2; *see also* Mot. at 6–8, and denies his personal involvement in creating any conditions at the Terrell Unit that, according to the Paynes, precipitated the violence on August 5, 1994, *see* Mot. at 4–5; *see also* Mot. at 4. The Paynes respond with the following series of propositions: the geographic housing and "free and frequent access" policies, the issuance of steel-toed boots, a lack of COs possessing sufficient experience and competence in 7 and 8 Buildings and the presence of African–American and Hispanic

gangs in close custody areas created a substantial risk of serious harm to close custody Caucasian inmates at the Terrell Unit,[49] Resp. at 3–6; this threat was so obvious that Price must have known about it, *see* Resp. at 3, 4–6; Price disregarded the obvious risk to close custody Caucasian inmates by failing to take measures to reduce the substantial risk of serious harm beyond monitoring inmate gang and group activity through the GIU, *see* Resp. at 5, 8; the paucity of action by Price permitted the substantial risk of serious harm to Caucasian close custody inmates to persist, *see* Resp. at 8–10, and; the conditions creating the danger to close custody Caucasian inmates triggered the fights involving Randy Payne, *see* Resp. at 8–10. They point to the following as proving Price's personal responsibility for the problems that climaxed with violence in Section B on August 5, 1994: Price's role as "chief administrative officer of the [Terrell Unit, who] was ultimately in charge of the security program that provided for the safety of the prisoners;" Price's approval of the "free and frequent access" policy;[50] Price's permitting the issuance of steel-toed boots to close custody inmates; Price's ability to "control where an inmate.was housed;" Price's establishment of the geographic housing policy,[51] and; Price's authority "to implement a policy requiring more experienced and competent guards for the close custody section."[52] Resp. at 8–10 & n. 4; *see also* Resp. at 5–6.

65. The evidence to which the Paynes point as creating a genuine issue on

48. Indeed, the record discloses no more than perhaps evidence sufficient to support a determination that Collins and Scott are at fault based on the theory of respondeat superior. *See supra* notes 23, 35. As such, it provides no basis for holding either of these officials liable for an Eighth Amendment violation. *See, e.g., Woods*, 51 F.3d at 583.

49. The Paynes presumably consider Johnson's practice of permitting prisoners to move between Sections as further heightening the danger to Caucasian prisoners in Pod C. *See* Resp. at 7.

50. The Paynes apparently believe that Price's admission that he sanctioned a change in the "free and frequent access" policy raises an inference that he approved the policy. *Compare* Resp. at 9 (citing Price Dep. at 93–94) *with* Price Dep. at 93–94.

51. The Paynes seem to consider the practice of placing close custody Hispanic inmates from South Texas and close custody inmates from West Texas in different Buildings to represent one aspect of the geographic housing policy. *See* Resp. at 9 & n. 3. *See generally* note 17.

52. The Paynes base their criticism of Price's failure to impose more stringent experience and competency requirements on COs working in close custody areas on the Operational Review Report's concern about the high concentration of COs with little relative experience on the second shift and Johnson's receipt of a "[l]ow" score for "[r]esponsibility" when she sought employment with the TDCJ–ID in 1993. *See* Resp. at 5.

Price's individual responsibility for the circumstances that they identify as leading to the fights involving Randy Payne is insufficient to create a necessity for trial. First, Price's admission of ultimate responsibility for the Terrell Unit's security, *supra* ¶ 32, can demonstrate nothing more than fault based on the theory of respondeat superior, an insufficient basis for constitutional liability. *See, e.g., Woods,* 51 F.3d at 583.

66. Second, the evidence offers no support for the Paynes' contentions regarding Price's role in the enactment of the "free and frequent access" and steel-toed workboots policies. Authorities other than Price enacted these measures. *See supra* ¶ 17 and note 21. Therefore, no causal connection between Price and the two policies exists. *See Hale,* 50 F.3d at 1583-84; *LaMarca,* 995 F.2d at 1539; *cf. Coleman,* 113 F.3d at 534.

67. Third, Price's concession that he was ultimately responsible for inmate housing decisions, *see supra* note 35, establishes nothing more than fault based on respondeat superior, an insufficient basis for constitutional liability.[53] *See, e.g., Woods,* 51 F.3d at 583.

68. Fourth, although Price apparently approved the geographic housing policy, *see supra* ¶ 19, he never appreciated its deleterious effect on prison security,[54] *see supra* ¶ 19 and note 20. His attitude reflected that of a prison official who "knew the underlying facts [engendering a substantial, even obvious, risk of harm] but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."[55] *Farmer,* 511 U.S. at 842, 114 S.Ct. at 1982, 128 L.Ed.2d at 828.

69. Finally, Price's decision to forgo imposing experience and competency requirements for COs working in close custody areas higher than those established by the TDCJ-ID,[56] *see supra* ¶ 32 and note 34, by itself, was not a deliberate disregard of a substantial risk of serious harm to inmates, assuming that such a threat existed.[57] Comparison of this particular inaction with omissions occurring in suits involving claims similar to the one made here shows that it fails to reflect the kind of official nonfeasance constituting an Eighth Amendment violation. *Compare Smith v. Arkansas Dep't of Correction,* 103 F.3d 637, 640-42, 645 (8th Cir.1996) (finding a deliberate disregard of a substantial risk of serious harm) *and Hale,* 50 F.3d at 1580-81, 1583 (same) *and LaMarca,* 995 F.2d at 1532-33, 1537-38 (same) *with Woods,* 110 F.3d at 1218, 1224-26 (warden's actions fail to evince a deliberate disregard of a substantial risk of serious harm) *and Street v. Corrections Corp. of Am.,* 102 F.3d 810, 817 (6th Cir.1996) (maintenance of prison staffing levels consistent with Tennessee Corrections Institute and the American Corrections Association provides "ample evidence" of a sufficient response by prison warden to staffing concern).

70. The Paynes' evidence falls short of creating a genuine issue of material fact. In other words, rather than "present[ing] ...

---

53. As the evidence fails to establish Price as directly participating in the decision on where to house Randy Payne, *see supra* note 25, any belief on the Paynes' part that he is liable because of personal involvement in that matter is unfounded. *See Hilton v. Zavaras,* 72 F.3d 137 (10th Cir.1995) (defendants' lack of personal involvement in decisions on cell assignments merits summary judgment in their favor).

54. Even if the practice of housing Hispanic close custody inmates from South Texas and Hispanic close custody inmates from West Texas in different Buildings constituted a facet of the geographic housing policy, *see supra* note 17, this conclusion that Price just wrongly assessed the geographic housing policy's effect on prison security remains unchanged, *cf. supra* note 33.

55. The Paynes offer no affirmative evidence raising a question about the sincerity of Price's outlook on the geographic housing policy. *See*

Resp. at 5 (just citing page 38 of Price's deposition); Resp. at 9 (just citing pages 139 and 140 of Price's deposition). *See generally supra* notes 7, 8.

56. Price cannot be held liable for inadequacies in the TDCJ-ID's training and certification standards because he played no role in setting them, *supra* note 22. *See Coleman,* 113 F.3d 528, 534 (plaintiff asserting constitutional claim under Section 1983 may not prevail based on a theory of respondeat inferior).

57. The imposition of stronger experience and competency standards for COs working in close custody areas is the only ameliorative measure to which the Paynes specifically point. *See* Resp. at 5-6, 8-10.

sufficient disagreement to require submission to a jury," the evidence regarding their failure-to-protect claim "is so one-sided that [Price] ... must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986). Their Eighth Amendment claim against Price, consequently, proves unable to survive his summary judgment motion.

### *Johnson*
### Attacks on the Merits of the Paynes' Claims

71. Johnson presents three arguments for why she should receive summary judgment on the merits. The first two prove unavailing, while the third one succeeds.

72. Johnson initially claims that the uncontroverted facts portray her as ignorant of the inmate violence on August 5, 1994, before she saw Randy Payne on the Section B stairs at approximately 8:30 p.m. Mot. 9, 11; Reply at 4–5. In response to this assertion, the Paynes contend the evidence raises a reasonable inference that Johnson witnessed the violence in Section B and took no action until it ended. *See* Resp. at 6.

73. Johnson's first argument lacks merit. Contrary to what she says, the record includes enough evidence to raise a genuine issue about whether or not she saw the fights involving Randy Payne and failed to respond until they concluded. Specifically, Torres states that, based on his personal knowledge, a CO in the control room of Pod C's guard tower properly performing his or her job would have seen the violence, Torres Aff. at 1, 2, while Katsaris provides testimony suggesting that no fighting could have been concealed from the view of the Pod C control room, Katsaris Aff. ¶ 2. *See Wright v. Jones*, 907 F.2d 848, 850 (8th Cir.1990) (whether prison guards witnessed a fight be-

tween inmates "was a question for the jury, since there was abundant evidence, including an investigative report prepared by prison officials, indicating that at least one fight took place between 4:00 p.m. and 4:30 p.m. in a hall that was plainly visible from the rotunda where the guards were stationed"); *cf. Fickes v. Jefferson County*, 900 F.Supp. 84, 89 (E.D.Tex.1995) ("[Defendant] claims that the fight [between the prisoners] did not erupt until after he had made his rounds. This sort of credibility determination is not appropriately resolved on a motion for summary judgment.").

74. Johnson also maintains that, "[e]ven if [she] ... had seen the assaults, Randy Payne did not have a constitutional right to have [her] ... risk her personal safety or the violation of TDCJ rules regulating the conduct of picket control officers in order to try to personally protect Payne from an assault." Mot. at 11; *see also* Mot. at 9. This argument is unavailing because it rests on an incomplete understanding of her constitutional duty. Regardless of whether the Eighth Amendment imposes an obligation on a prison official to intervene directly in an inmate fight when doing so either would place him or her in danger of physical harm,[58] or would require the abandonment of his or her station in violation of prison regulations, it demands that he or she take *some* action to halt the violence. *See Davidson v. Cannon*, 474 U.S. 344, 348, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677, 683 (1986) ("Petitioner's claim, based on respondents' negligence, is quite different from one involving injuries caused ... by another prisoner where officials simply stood by and permitted the attack to proceed.");[59] *Billman v. Indiana Dep't of Corrections*, 56 F.3d 785, 790 (7th Cir.1995) ("Of course to be liable under the standard of [deliberate indifference] ... the guards would have to be more than negli-

---

58. Some courts recognize that prison officials are not compelled under the Eighth Amendment to intercede in prisoner tussles when doing so would jeopardize their physical well-being. *See Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997); *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir.1995) (citing *Arnold v. Jones*, 891 F.2d 1370, 1373 (8th Cir.1989)); *MacKay v. Farnsworth*, 48 F.3d 491, 493 (10th Cir.1995).

59. Despite its concern with the Fourteenth Amendment's due process clause, *Davidson* constitutes part of Eighth Amendment jurisprudence. *See Green*, 788 F.2d at 1120–21; *see also McGill*, 944 F.2d at 347.

gent—would, for example—have had to watch the rape in progress yet have done nothing to stop it though in a position to do so."); *Williams v. Mueller*, 13 F.3d 1214, 1216 (8th Cir.1994) ("A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault."); *see also Willis v. Estrada*, No. 91 C 6288, 1995 WL 398873, at *2 (N.D.Ill. July 2, 1995); *Holloway v. Wittry*, 842 F.Supp. 1193, 1195–96, 1199–1200 (S.D.Iowa 1994).

■ 75. Finally, Johnson claims that "was never in possession of any information that [Randy Payne] ... was being assaulted." Mot. at 12; *see also* Mot. at 9; Johnson Aff. ¶ 7 ("Prior to my seeking inmate Payne walking down the stairs ... at approximately 8:30 p.m., I had not seen inmate Payne being assaulted or struck by any inmate at any time, nor did I have any idea that Payne was being or had been assaulted by any inmate at any time."). In response to this contention, the Paynes essentially assert that Johnson broke a prison rule requiring COs to investigate or report suspicious prisoner activity when she failed to take any action in response to the group of inmates gathered near Section B's third level showers [60] and when she failed to take any action in response to two inmates peering into Section B's third level showers during the time when Randy Payne was fighting. *Compare* Resp. at 6 *with supra* ¶ 28. According to them, "[t]he only conclusion to be drawn [from this situa-

tion] is that she deliberately ignored a known risk of inmate assault." [61] Resp. at 6.

■ 76. The Paynes fail to carry their summary judgment burden. Showing nothing more than the breach of a prison rule or regulation, which is all they really do, *see* Resp. at 6, establishes no Eighth Amendment violation. *See Langston*, 100 F.3d at 1238 ("But ignoring internal prison procedures does not mean that a constitutional violation has occurred."); *Falls*, 966 F.2d at 380 ("a prison official's violation of an internal regulation does not give rise to an Eighth Amendment claim ..., in the absence of objective evidence demonstrating that prison officials were deliberately indifferent to a prisoner's constitutional rights"); *see also DesRosiers v. Moran*, 949 F.2d 15, 21 (1st Cir.1991) ("Not every breach of prison regulations will give rise to an Eighth Amendment claim. What counts is whether the official conduct of which the plaintiff complains was in derogation of the constitutionally mandated 'deliberate indifference' standard."); *Taylor v. Puckett*, No. CIV.A. 4:96CV270–D, 1996 WL 692214, at *1, *2 (N.D.Miss. Nov.14, 1996) (Eighth Amendment claim) (citing *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir.1996), for the proposition that a violation of prison policy by defendants "does not mean that they have violated the plaintiff's constitutional rights"). Consequently, Johnson receives summary judgment as to the additional Eighth Amendment violation of which the Paynes accuse her.[62]

**60.** The Paynes believe that Johnson noticed the prisoners congregating around the third level showers during the period when the fights involving Randy Payne were occurring. *See supra* note 30.

**61.** The Paynes waive a third basis for holding Johnson liable, which posits that she exhibited deliberate indifference to a substantial risk of serious harm by "abandon[ing] her post or [being] ... asleep on the job" at the time of the violence. Resp. at 6, by omitting it from the Joint Final Pretrial Order, *see* Pre-Trial Order at 2, 4–6. *See Hall v. State Farm Fire & Casualty Co.*, 937 F.2d 210, 212 (5th Cir.1991) ("An issue or theory not even implicitly included in ... [a] pretrial order is barred unless the order is later amended 'to prevent manifest injustice.' "); *cf. Trinity Carton Co. v. Falstaff Brewing Corp.*, 767 F.2d 184, 192 n. 13 (5th Cir.1985) ("Each party

has an affirmative duty to allege at the pretrial conference all factual and legal bases upon which the party wishes to litigate the case."), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986).

**62.** The rationale for granting summary judgment to Johnson on the second theory of liability advanced by the Paynes makes unnecessary consideration of the Paynes' highly questionable assumption that "suspicious [inmate] activity" equates with conduct signaling a serious danger to prisoners, Resp. at 6. *See Sterns v. Bruce*, C–964–3461 EFL, 1995 WL 396850, at *2 (N.D.Cal. June 29, 1995) (for an Eighth Amendment duty to act to arise, a prison official "must ... have more than a 'mere suspicion' that an attack will occur") (citing *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir.1986) (quoting *Camic*, 712 F.2d at 1146)).

### Qualified Immunity

77. Johnson's lack of success in challenging the Paynes' charge that she saw the fights involving Randy Payne in Section B on August 5, 1994, and failed to respond until they ended necessitates consideration of whether or not she should receive qualified immunity on this matter. *See supra* ¶ 10.

78. Johnson must plead her good faith and establish that she was acting within the scope of her discretionary authority when her alleged misconduct transpired. *See Saldana*, 684 F.2d at 1163 & n. 14. She carries this burden by establishing that she was on duty in the control room of Pod C's guard tower at the time of the altercations between Randy Payne and other prisoners in Section B.[63] *Compare supra* ¶ 26 *with* note 26.

 79. Because Johnson makes her requisite showing, the Paynes must present enough evidence to create a genuine issue as to whether or not she violated a clearly constitutional right, and, if so, whether or not her behavior was objectively unreasonable in light of that right.

 80. The Paynes carry their summary judgment burden. Specifically, they offer significant probative evidence raising a reasonable inference that Johnson witnessed the violence in Section B but took no action until it stopped. *See supra* ¶ 73. As of August 5, 1994, such behavior was clearly established as violative of the Eighth Amendment and no objectively reasonable public official would have engaged in it. *See Farmer*, 511 U.S. at 832, 114 S.Ct. at 1977, 128 L.Ed.2d at 822–23 ("[p]rison conditions may be 'restrictive and even harsh,' but gratuitously allowing a beating or rape of one prisoner by another serves no 'legitimate penological objective'"); *Williams* 13 F.3d at 1216 (citing cases); *Holloway*, 842 F.Supp. at 1195–96, 1199–1200; *Saunders v. Godinez*, No. 93 C 3212, 1994 WL 542770, at *3 n. 1 (N.D.Ill. Oct.3, 1994); *see also Davidson*, 474 U.S. at 348, 106 S.Ct. at 670–71, 88 L.Ed.2d at 683; *Morales v. New York State Dep't of Corrections*, 842 F.2d 27, 29–30 (2d Cir.1988) (relying on *Davidson* to find that a

prison official's failure to take any action whatsoever when he saw one inmate assaulting another violated the Eighth Amendment). Consequently, Johnson fails to secure qualified immunity. *See DeJohnette v. Lipinski*, No. 95 C 5391, 1997 WL 137177 (N.D.Ill. Mar.24, 1997) ("[Defendant's] qualified immunity defense hinges directly on whose story the finder of fact believes. For this reason, summary judgment is not appropriate on the issue of qualified immunity because 'it cannot be determined before trial whether [she] ... [exhibited inaction] ... which violated clearly established constitutional rights.'" (internal quotations omitted)).

### Conclusion

81. The court grants Collins' motion for summary judgment.

82. The court grants Scott's motion for summary judgment.

83. The court grants Price's motion for summary judgment.

84. The court denies Johnson's motion for summary judgment as to the Paynes' contention that she took no action to stop the fights involving Randy Payne until they ended.

85. The court grants Johnson's motion for summary judgment as to the Paynes' contention that she took no action when she noticed some inmates congregating outside of the third level showers in Section B showers on August 5, 1994, and when she saw two inmates looking into the third level showers in Section on August 5, 1994.

---

**63.** In her latest pleading, Johnson asserts that she is entitled to qualified immunity. Defs.' First Am. Ans.; Req. for Ct. to Order Rule 7(a) Reply Under *Schultea* at 9.